Paul L. WALTHAL, Gibson J. Haynes, and Jeffrey S. Coffey, Plaintiffs–Appellees,

v.

Corey RUSK d/b/a Touch and Go Records, Touch and Go Records, Inc., and Touch and Go Distributions, Inc., Defendants–Appellants.

No. 98–1659.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 7, 1998.

Decided March 26, 1999.

---

Elliot B. Pollock, Chicago, IL; Sawnie R. Aldredge (argued), Zumwalt, Almon & Hayes, Nashville, TN, for Plaintiffs–Appellees.

Arthur U. Ellis, Chicago, IL; Santiago A. Durango (argued), Sandy, UT, for Defendants–Appellants.

Before COFFEY, FLAUM, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Paul L. Walthal, Gibson J. Haynes, and Jeffrey S. Coffey are the Butthole Surfers. For the unenlightened, that's a musical group.[1] In 1984 they entered into an agreement with Corey Rusk, who had formed a company which eventually became Touch and Go Distributions, Inc. and Touch and Go Records, Inc., both Illinois corporations. Under the agreement, Touch and Go was granted the nonexclusive right to manufacture and sell copies of the Butthole Surfers' musical performances in return for a 50 percent share of the net profits.

One would ordinarily think that an agreement of the type we just described would be in writing, for as Yogi Berra observed, "A oral contract isn't worth the paper it's written on." But, alas, the Butthole Surfers and Touch and Go never got around to writing up their deal. So what we have here is simply an oral licensing agreement between the parties that had no specified duration; it did not set out any circumstances giving rise to a right of termination. Under the agreement, until the dispute before us raised its head, the Butthole Surfers provided Touch and Go with six recorded performances and one video performance to manufacture and sell.

On December 4, 1995, the Butthole Surfers demanded that the agreed 50/50 split be changed to a more favorable (for them) 80/20 split and that the agreement terminate in 3 years. Touch and Go responded, in writing, that it considered the parties bound by the original agreement. On December 8 the Butthole Surfers sent a letter terminating the agreement effective immediately and demanding a return of inventory. Touch and Go, however, continued to copy and sell the performances— an action that fueled this suit claiming

1. A sampling of the Butthole Surfers' recordings include: "Hurdy Gurdy Man"; "Lady Sniff"; "John E. Smoke"; "The Annoying Song"; "The Shah Sleeps in Lee Harvey's Grave"; "Goofy's Concern"; and "Chewin' George Lucas' Chocolate."

copyright infringement along with several pendent state-law claims.

The district court granted a summary judgment motion filed by the Butthole Surfers on the pivotal issue in the case—whether 17 U.S.C. § 203 prohibits the termination of the agreement. The court determined that the Butthole Surfers' termination of the licensing agreement was effective and, accordingly, infringement by the defendants was found. The decision prompted a stipulation disposing of the remainder of the case, and this appeal followed.

■ Touch and Go presents two primary issues. The first is that the licensing agreement is irrevocable because consideration—the 50 percent share of the profits—was paid. This contention is without merit. The other issue, which is seriously pursued, is that termination of the agreement was prohibited by § 203 of the Copyright Act. The argument here is that the statute prohibits the termination of a copyright license—including one of unspecified duration arising out of an oral agreement—prior to 35 years from the date the license was granted. It is to this issue we now turn.

■ Section 203 provides that "the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright ... is subject to termination" under certain conditions. As relevant here, subsection (3) provides:

> Termination of the grant may be effected at any time during a period of five years beginning at the end of thirty-five years from the date of execution of the grant[.]

The disagreement before us is simply whether the statute establishes 35 years as a minimum or maximum term of a grant. That is, is the statute an attempt to ensure that regardless of the terms of the agreement—say an agreement for the life of the

copyright—between the copyright owner and the licensee, the agreement can, nevertheless, be terminated after 35 years, or whether no agreement can be terminated until 35 years have passed, or something in between those extremes.

Despite the fact that § 203 was enacted over 20 years ago as part of the Copyright Act of 1976, there is very limited case law on its interpretation. The only case from a court of appeals is from the Ninth Circuit, *Rano v. Sipa Press*, 987 F.2d 580 (1993).[2] Kip Rano was a professional photographer who granted a nonexclusive license of unspecified duration to Sipa to reproduce, distribute, and sell his photographs. The relationship continued for about 8 years; Rano then attempted to revoke the agreement and, when Sipa continued to sell the photographs, sued for copyright infringement. The court of appeals recognized that California law, which was the relevant jurisdiction, allowed for termination at will of agreements of nonspecified duration and that under appropriate circumstances the copyright law allows the use of pertinent state law. However, the court said that the "application of this principle of California contract law here would directly conflict with federal copyright law" so the state law, the court concluded, was preempted. The court then interpreted § 203 to mean that unless a license explicitly specifies an earlier termination date, it cannot be terminated prior to 35 years.

To put it mildly, this result is deplored by commentators. If the *Rano* decision were a Broadway show, bad reviews would have forced it to close after opening night. Nimmer, for instance, finds *Rano* a "remarkable result," a "wayward result," "stunning, both for its utter absence of support in law and for the breadth of its error." Nimmer says that the 35–year period in § 203 is a maximum period that a contract can be enforced, not a minimum

2. Because our decision conflicts with the Ninth Circuit's opinion in *Rano*, it has been circulated through all members of the court

in active service. No judge has voted to hear this case *en banc*.

as *Rano* holds. *See* 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyrights* § 11.01 (1998). William T. Rintala says that the *Rano* court's ruling turns protection for authors into a "windfall for those acquiring rights for an indefinite term." William T. Rintala, *Copyright Update—Substantive Law*, 379 PLI/Pat at 271, 325–26 (Practicing Law Institute, Patents, Copyrights, Trademarks, and Literary Property Course Handbook Series, 1994). Yet another commentator calls *Rano* a "ridiculously incorrect interpretation of the statute. It takes a provision meant to protect the author and turns it into a straitjacket." Mark F. Radcliffe, *Copyright Ownership Issues*, 411 PLI/Pat at 243, 300 (Practicing Law Institute, Patents, Copyrights, Trademarks, and Literary Property Course Handbook Series, 1995).

We think it's time to take a fresh look at § 203, putting the statute in context, and because its plain meaning is not perfectly clear, we will cast a glance at its legislative history for whatever guidance it might disclose. The term of a copyright is the life of the author plus 50 years. 17 U.S.C. § 302(a). The ownership of a copyright vests in the author, who, of course, may transfer his rights as he sees fit. 17 U.S.C. § 201(a). A "transfer of copyright ownership" is an "assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license." 17 U.S.C. § 101. Transfers of ownership must be in writing. 17 U.S.C. § 204(a). Nonexclusive licenses are excluded from the definition of "transfer of copyright ownership." Therefore,

nonexclusive licenses such as the one we are considering here may be granted orally, but they do not transfer ownership of the copyright. *I.A.E., Inc. v. Shaver*, 74 F.3d 768 (7th Cir.1996).

The purpose of § 203 is to give authors and their heirs a second chance to market works even after a transfer of rights has been. made. Often, it is not clear, soon after the creation of a work, how valuable it will prove to be.[3] Congress intended to safeguard "authors against unremunerative transfers." The provision was needed "because of the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited." H.R.Rep. No. 94–1476, at 124 (1976); S.Rep. No. 94–473, at 108 (1975), U.S.Code Cong. & Admin.News 1976, 5659, 5740. Therefore, if an author had granted a license for the life of the copyright, or for some long period of time, he could nevertheless terminate the license after 35 years and look around for a better deal. *See* 3 *Nimmer on Copyright* § 11.01 *et seq.* The House and Senate reports both said:

Nothing contained in this section or elsewhere in this legislation is intended to extend the duration of any license, transfer or assignment made for a period of less than thirty-five years. If, for example, an agreement provides an earlier termination date or lesser duration, or if it allows the author the right of canceling or terminating the agreement under certain circumstances, the duration is governed by the agreement. Likewise, nothing in this section or legislation is intended to change the existing state of the law of contracts concerning the circumstances in which an

3. For example, when Richard Berry, a small-time performer in the mid–1950's, sold the publication rights to his song "Louie, Louie" for $750, he had no idea it would reemerge in the early 1960's as a monster hit. "Louie, Louie" was recorded by the Kingsmen and, despite its slurred and almost incomprehensible lyrics, it soon became a raucous rock anthem. It has been sung by hundreds upon hundreds of artists from Bruce Springsteen and Otis Redding to Junior Cadillac and David Begel, all the time earning untold millions of dollars for producers and performers other than Berry. *See Louie, Louie: The History and Mythology of the World's Most Famous Rock 'n Roll Song*, by Dave Marsh.

author may cancel or terminate a license, transfer, or assignment.

H.R.Rep. No. 94–1476, at 128; S.Rep. No. 94–473, at 111, U.S.Code Cong.& Admin.News 1976, at 5743.

In this context it makes no sense that a 35–year period be considered a minimum under the statute. If the term of the license originally granted was less than 35 years, the statute simply does not compel that the license be effective for 35 years. And even the *Rano* court did not go so far. The Ninth Circuit said that § 203 means that agreements are terminable only after 35 years *"unless they explicitly specify an earlier termination date."* At 585 (emphasis added). But the court nevertheless determined that if the agreement contained no termination date, it must continue for 35 years because § 203 preempted state contract law providing for termination at will of contracts of unspecified length. By this reasoning, a contract for a specific term of less than 35 years does not conflict with the 35–year period but a contract which is terminable at will by operation of law does.

■ We disagree with any such conclusion. In general, state contract laws pertain to the transfer of interests under the Copyright Act. Section 203(b)(5) itself specifically provides that termination of a grant under the statute "in no way affects rights arising under any other Federal, State, or foreign laws." In our case it is undisputed that, unless it is preempted, Illinois law applies to the dispute and that under the law of Illinois a contract of unspecified length is terminable at will. *Consolidated Labs., Inc. v. Shandon Scientific Co.,* 413 F.2d 208 (7th Cir.1969). And when a contract is silent as to its length, it is implicit that it can be terminated by either side. As the Supreme Court has stated:

Laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as fully as if they had been expressly referred to or incorporated in its terms.

*Norfolk & Western Ry. v. American Train Dispatchers Ass'n,* 499 U.S. 117, 130, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991), quoting *Farmers and Merchants Bank of Monroe v. Federal Reserve Bank of Richmond,* 262 U.S. 649, 660, 43 S.Ct. 651, 67 L.Ed. 1157 (1923).

■ However, as the *Rano* court correctly points out, state contract law cannot provide the basis of a decision if that law conflicts with federal law. *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). Under the principle of preemption, for instance, in light of the existence of § 203, we could not use common law rules for the interpretation of contracts to require that a contract for the life of the copyright be enforced for that length of time. That interpretation would be in direct conflict with § 203. In contrast, a contract which implicitly provides for termination, as this one does under Illinois law, presents no conflict with § 203. This contract does not differ in any meaningful way from a contract which specifies a term of, for instance, 10 years, which would be terminable at the end of the 10–year period. And, in fact, in addition to allowing termination if the contract allows for a specific earlier termination date, Congress said that the statute also provides that a contract might allow the author the right to cancel or terminate the agreement "under certain circumstances," in which case the duration is "governed by the agreement." H.R.Rep. No. 94–1476, at 128; S.Rep. No. 94–473, at 111, U.S.Code Cong. & Admin.News 1976, at 5743. We conclude that allowing terminations under Illinois law does not conflict with § 203, but rather is, in fact, in keeping with the intent of § 203. Therefore, there is no issue of preemption. Under Illinois law, this contract can be terminated, and it is undisputed that the Butthole Surfers' letter of December 8, 1995, did just that. That letter rendered the license agreement kaput.

Accordingly, the decision of the district court is

AFFIRMED.