In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-1172

AUTOMATION BY DESIGN, INCORPORATED,

*Plaintiff-Appellant*,

*v.*

RAYBESTOS PRODUCTS COMPANY,
RAYTECH CORPORATION AND PRODUCTION
DESIGN SERVICES, INCORPORATED,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1: 03-CV-0575-JDT-TAB—**John Daniel Tinder,** *Judge*.

ARGUED SEPTEMBER 20, 2005—DECIDED SEPTEMBER 15, 2006

Before CUDAHY, KANNE, and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge.* In this copyright infringement dispute, Automation by Design, Inc. (ABD) alleges that Raybestos Products Company, a wholly owned subsidiary of Raytech Corp., (together "Raybestos" or "RPC") infringed on its copyright and breached their agreement when it hired Production Design Services, Inc. (PDSI) to build a duplicate machine of one that ABD had designed and built for Raybestos several years earlier. Because we find that Raybestos did not violate the terms of the license agreement, we affirm the decision of the district court granting

summary judgment and declaratory judgment in favor of the defendants, Raybestos and PDSI.

## I.

Raybestos manufactures parts used in the automotive industry. In late 1998 or early 1999 it contacted ABD, a designer and manufacturer of automated assembly machines, to initiate negotiations for a contract to manufacture an automated clutch plate assembly machine to replace an existing one. Representatives from the companies met several times and ABD submitted three separate offers, none of which was accepted by Raybestos. On June 21, 1999, following further discussions by the parties, ABD sent Raybestos a letter offering to build the clutch plate assembly machine for $756,000. Among other things, the June 21 offer letter memorialized the parties' earlier agreement that Raybestos would itself purchase all of the component parts for the machine, allegedly due to concerns about ABD's financial health. The letter also contained the following language which forms the gordian knot of this case:

> ABD grants RPC the right to duplicate any or all design copyrighted by ABD, as it relates to this project. This "license" is non-transferrable and is only for equipment to be used exclusively by RPC and does include any equipment to be fabricated for resale or transferred to a customer or supplier of RPC.

(R. at 90, Ex. M, p. 2).

Raybestos accepted the terms of this June 21 offer letter and, on June 24, 1999, issued a purchase order. The purchase order required, among other things, that ABD design, construct, and install a clutch plate assembly machine and provide Raybestos with a reproducible set of machine drawings. The purchase order also reflected the parties' agreement that "the price for duplicates of this

machine will be for not more than 85% of the price of this machine." (R. at 90, Ex. N, p. 2). ABD accepted the terms of the purchase order and designed, manufactured and, sometime in the summer of 2000, installed the machine and delivered to Raybestos all of the documentation specified in the purchase order, including the machine design drawings. ABD affixed a copyright symbol to each drawing.

All remained well until late 2001 or early 2002, when Raybestos contacted ABD and requested a quote for a second machine expecting the 15% discount described in the June 24, 1999 purchase order. The quote from ABD, however, was not 15% less than the price of the first machine, but rather it was 10% higher. ABD asserts that because Raybestos requested over thirty material changes to the machine, ABD did not view the second machine as a duplicate of the original, subject to the terms of the discount. Raybestos disagreed.

Smarting from the higher quote, Raybestos sought bids from alternate suppliers, but continued to negotiate with ABD. During negotiations, Raybestos informed ABD that it had received a bid for nearly $250,000 less than ABD's bid. In response, on July 3, 2002, ABD's attorney delivered a letter to Raybestos declaring that "the Plans are the exclusive property of Automation by Design, and may not be reproduced or used by Raybestos or provided by Raybestos to any third party for its use." (R. at 90, Ex. V). Raybestos countered this claim by pointing to the language of the purchase order granting Raybestos the right to duplicate any or all designs for equipment to be used exclusively by Raybestos. ABD's letter also revoked the license effective immediately and demanded the return of the designs. Raybestos disagreed with ABD's interpretation of the contract language and continued to pursue alternate suppliers. Toward that end, during fall 2002, Raybestos made three copies of the machine manual. Ken Harlan, Raybestos' manager of Technical Services, delivered one

copy of the manual to each of six different suppliers with directions to return the copy with its bid along with a confidentiality agreement. When one supplier returned the copy of the machine manual, Harlan delivered that same copy to another supplier. All of the copies of the machine manual were returned to Raybestos with the bids. Ultimately Raybestos chose PDSI to design and install the second machine, incorporating the thirty-three changes requested by Raybestos, and, some time after June 30, 2003, Raybestos provided PDSI with a copy of ABD's drawings to use during the manufacturing process. PDSI made a photocopy of the ABD drawings and used the manual to obtain the list of component suppliers and to identify the various changes that Raybestos requested. At the end of its process, PDSI generated a complete set of its own drawings for the machine it built.

On March 31, 2003, ABD registered its copyright with the U.S. Copyright Office.[1] ABD does not hold a patent on the ABD Machine or any part of it. ABD subsequently brought a claim against Raybestos and PDSI alleging copyright infringement and breach of contract and requesting declaratory relief. Raybestos and PDSI counterclaimed for breach of contract and declaratory relief. Upon the defendants' motion, the district court granted summary judgment for the defendants. Thereafter the defendants moved the district court for entry of a declaratory judgment in their favor and against ABD. Raybestos separately moved to voluntarily dismiss its breach of contract claim. The district court granted the defendants' motions and entered final judgment in favor of the defendants and against ABD. ABD appeals and we affirm.

---

[1] Registration is not a condition of copyright protection, but is necessary before an infringement suit may be filed in court. *See* 17 U.S.C. § 411.

**II.**

For the most part the parties do not dispute the course of events described above (with minor disagreements regarding motivation and intent). The crux of the dispute is whether the language of ABD's June 21,1999 letter, and Raybestos' responsive purchase order of June 24, 1999, which together formed the contract between the parties, allowed Raybestos to act as it did—that is, to hire PDSI to create a second clutch plate assembly machine. Because the primary question is interpretation of a written contract, this matter is particularly amenable to summary judgment, *Cherry v. Auburn Gear, Inc.*, 441 F.3d 476, 481 (7th Cir. 2006) (explaining that where there is no contractual ambiguity, a contract's interpretation is a matter of law); *Orthodontic Affiliates, P.C. v. Long,* 841 N.E.2d 219, 222 (Ind. Ct. App. 2006) ("Generally, the construction of a written contract is a question of law for which summary judgment is particularly appropriate."), which we will grant after de novo review if there are no questions of material fact and the defendants are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Hess v. Reg-Ellen Mach. Tool Corp.*, 423 F.3d 653, 658 (7th Cir. 2005).

**A.  Copyright infringement.**

Although the United States Copyright Act, 17 U.S.C. §§ 101-1332, grants exclusive jurisdiction for infringement claims to the federal courts, those courts construe copyrights as contracts and turn to the relevant state law to interpret them. *Kennedy v. Nat'l Juvenile Det. Ass'n*, 187 F.3d 690, 694 (7th Cir. 1999). The district court properly turned to Indiana law to resolve the dispute between these two corporations whose principal places of business are in Indiana. (R. at 104, p. 7). Under Indiana contract law, interpretation of an unambiguous contract is a matter of law that can be resolved on summary judgment. *Orthodon-*

*tic Affiliates, P.C.,* 841 N.E.2d at 222. Ambiguous contracts, on the other hand, must be set before a trier of fact to ascertain the facts necessary to construe the contract. *Id.* When a court grants summary judgment it has necessarily determined that the contract is not ambiguous or that any existing ambiguity can be resolved without the aid of a factual determination. *Perryman v. Motorist Mut. Ins. Co.*, 846 N.E.2d 683, 687 (Ind. Ct. App. 2006).

ABD maintains that the contract at issue in this case is ambiguous and that it cannot be interpreted without resort to parol evidence. Raybestos counters that ABD failed to make this argument to the district court and therefore has waived the right to do so in this court. Although it is true that the arguments were framed slightly differently in the summary judgment briefing below (R. at 90, 97, 100), ABD sufficiently raised the question of ambiguity to preserve its right to argue to this court that the language of the contract fails to clearly define which subdivided copyrights ABD granted to Raybestos—a question to which we now turn.

The rights comprised in a copyright may be subdivided and transferred. 17 U.S.C. 201(d)(2) ("Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred as provided by clause (1) and owned separately."). In other words, a copyright holder may transfer the right to duplicate to one person, the right to distribute to another, and the right to produce derivative works to yet another. *See ITOFCA Inc. v. MegaTrans Logistics, Inc.*, 322 F.3d 928, 929-30 (7th Cir. 2003) ("Making and selling are distinct rights and you can assign one without the other."). This case turns on which subdividable rights ABD granted to Raybestos.

To determine which rights ABD granted to Raybestos, we look to the language of the agreement. If, and only if, the

language is ambiguous may we turn to evidence outside of the four corners of the agreement to determine the parameters of the license. *Magee v. Garry-Magee*, 833 N.E.2d 1083, 1087 (Ind. Ct. App. 2005). The language of a contract is not ambiguous simply because the parties disagree as to the meaning of the terms. *Simon Prop. Group, L.P. v. Mich. Sporting Goods Distrib., Inc.*, 837 N.E.2d 1058, 1070 (Ind. Ct. App. 2005). "A contract is ambiguous only where a reasonable person could find its terms susceptible to more than one interpretation." *Cummins v. McIntosh*, 845 N.E.2d 1097, 1104 (Ind. Ct. App. 2006). To determine if there are any ambiguities in the contested two sentences of the June 21, 1999 letter, we begin by eliminating that which is clear. Both parties agree that the license unambiguously gave Raybestos the right to duplicate the designs of the clutch plate assembly machine. The language as to this point is unequivocally clear: "ABD grants RPC the right to duplicate any or all design copyrighted by ABD, as it relates to this project." (R. at 90, Ex. M, p. 2).

The next sentence of the keystone paragraph states that the "license"—that is, "the right to duplicate any or all design"—"is only for equipment to be used exclusively by RPC." The question then becomes: what does it mean to be permitted to use a license "for equipment." One obvious way to use a "right to duplicate the design" license "for equipment" is to duplicate that equipment. Consequently, the language on its face appears to allow Raybestos to duplicate the equipment. Indeed, ABD itself agrees that Raybestos could duplicate the equipment, so on this point the language is clear. ABD argues, however, that Raybestos could duplicate only *parts* of the equipment and then solely for the purpose of maintenance and repair. (ABD brief at 17, 19); (Reply brief at 11). As evidence for this proposition, ABD points to its June 14, 2001 letter to Raybestos which states, "for maintenance and repair purposes, Raybestos Products Company does have the right to duplicate parts of

the assembler." (R. at 90, Ex. M, p. 2). As just noted above, however, where the terms of a contract are clear and unambiguous, this court cannot consider extrinsic evidence. *Magee*, 833 N.E.2d at 1087. The parties' agreement as to the meaning of this language—that Raybestos had the right to duplicate equipment—constitutes vigorous proof of the clarity of language. Indeed, if the parties agree as to the meaning, it seems certain that a reasonable person could interpret this language in only one way. *See Cummins*, 845 N.E.2d at 1004. The major dispute then turns on whether Raybestos had the right to duplicate only parts of the equipment, as ABD maintains, or to duplicate the machine in toto, as Raybestos argues—a question to which we will turn momentarily. In any case, reviewing the controverted language to this point, we can conclude that resort to extrinsic evidence is unavailable given the lack of ambiguity in the agreement.

Interestingly, even if we were to consider the proffered parol evidence, that evidence only would serve to clarify this interpretation. The letter to which ABD refers makes clear that the agreement allows Raybestos to use the designs to duplicate parts of the machinery (as opposed to simply duplicating the design itself, as by photocopy). Raybestos insists that the letter makes clear that Raybestos could duplicate parts solely for maintenance and repair purposes: "for maintenance and replacement purposes, Raybestos Products Company does have the right to duplicate parts of the assembler." (R. at 90, Ex. S). Nothing in that letter, however, *limits* Raybestos to duplicating parts for maintenance and repair only. The letter, after all, was written in response to Raybestos' purchase order for a specific part, and only addresses, therefore, Raybestos' right to replace that particular part. To understand Raybestos' copyright permission in other contexts, one would have to turn back to the language of the agreement which, as we interpreted above, issues a broad grant to duplicate any or all designs

"for the equipment." In this way the extrinsic evidence further clarifies the language of the agreement which, on its face, grants Raybestos the right to use the license to duplicate parts of the equipment.

We emphasize, however, that because the language of the contract is subject to only one interpretation, we need not and will not rely on extrinsic evidence to guide our way. Similarly, the court cannot add to, vary, or explain the terms of this unambiguous agreement. *Cooper v. Cooper*, 730 N.E.2d 212, 215 (Ind. Ct. App. 2000). Consequently, we reject ABD's invitation to the court to interpret the contract or add language to it limiting the license to the repair and maintenance of the machine.

Turning to the second sentence of the disputed paragraph, ABD's letter states that the "license is non-transferable"—language that is similarly unambiguous. In other words, whatever rights ABD granted to Raybestos, Raybestos could not transfer those rights to another. The sentence that follows augments and clarifies this conclusion: the license "is only for equipment to be used exclusively by [Raybestos] . . . ." This language indicates that ABD intended to prevent Raybestos from using ABD's designs to enter the clutch plate assembly business itself—that is from manufacturing clutch plate assembly machines for sale to others. Similarly, it intended to prevent Raybestos from transferring the designs to a third party to manufacture equipment to be used by or sold to entities other than Raybestos.

After this point, however, the streak of clarity ends. Recall the language of the June 21 letter:

> ABD grants RPC the right to duplicate any or all design copyrighted by ABD, as it relates to this project. This "license" is non-transferrable and is only for equipment to be used exclusively by RPC **and *does* include any**

**equipment to be fabricated for resale or transferred to a customer or supplier of RPC.**

(R. at 90, Ex. M, p. 2) (both bold and italicized emphasis ours). The second sentence of this paragraph is made up of two clauses which appear to contradict one another. In the first clause it restricts Raybestos' use of the license to "equipment to be used exclusively by [Raybestos]." The second half of the sentence, however, seems to allow Raybestos the use of the license to fabricate equipment for resale or to transfer equipment to a customer or supplier—a seemingly limitless grant of permission to use the license, including a grant to use the license to compete directly with ABD. Neither party mentions this contradiction in the briefing before this court and the district court ignores it as well, most likely because all parties assumed, as we do, that ABD meant to include the word "not" between the word "does" and "include." In fact, in depositions the deponents repeatedly read the contract to include the word "not."[2] Resolving this ambiguity is not

---

[2] Defendant's Memorandum of Law in Support of Motion for Summary Judgment mentions the dispute but maintains that it is not relevant. (R. at 90, p. 16, n.2).

The matter was also raised during depositions but not addressed further, or at least not discussed in the portions of the depositions provided to this court. These portions support the hypothesis that everyone assumed that the license did **not** include any equipment to be fabricated for resale or transferred to a customer or supplier of RPC.

During the deposition of ABD principal John Kirk by counsel for Raybestos, the following exchange occurred:

Q:  Okay. The second sentence, if you could read that to me.

A:  "This license is non-transferrable and is only for equipment to be used exclusively by RPC and does not include any equipment to be fabricated for resale or transferred to a
(continued...)

necessary for the resolution of this matter (indeed, as just noted, neither the parties nor the district court mentioned it). Such a glaring contradiction in the key paragraph of the contractual language warrants mention, however, if not resolution. We could resolve the matter simply by applying the doctrine of mutual mistake, and, since the ambiguity is one that can be resolved without aid of a factual determination, it does not prevent a grant of summary judgment. *See Perryman*, 846 N.E.2d at 687. But

---

[2]  (...continued)
customer or supplier of RPC."

> Q.  You read "does not" include. Does it say does not include?

> A:  No, it does not. It says "does include." Sorry.

The attorney then moved to a new subject and from what we can tell from the portions of the transcript provided, it was not mentioned again. (R. at 90, Ex. E, p. 221, l.23-p. 222, l.9).

Similarly, in a portion of the deposition of Raybestos employee Jan Morse by an attorney for ABD, Morse, without comment, read a "not" into the sentence:

> Q:  Okay, so that second sentence of the paragraph that we're looking at, please read that out loud again.

> A:  "This license is non-transferrable and is only for equipment to be used exclusively by RPC and does **not** include any equipment to be fabricated or for resale or transferred to customer or supplier of RPC."

> Q:  What is your understanding of the meaning of that sentence?

> Q:  I don't know. It gets a little bit confusing in its structure, I think, a little bit.

> A.  Go ahead and take your time to read it over again if you like.

(R. at 90, Ex. I, p. 252, l.10-p. 252, l.9) (emphasis ours).

The remainder of this line of questioning was not provided to this court.

because such resolution is not necessary for a decision in this case, we mention the contradiction solely for the sake of thoroughness.

Having reviewed all of the key language of the contract, we can turn to the parties' arguments regarding the alleged transfer of the design. According to ABD, Raybestos violated the agreement when it transferred the design to PDSI for the purpose of allowing PDSI to manufacture a duplicate machine for Raybestos' use. ABD makes two claims regarding transferability and distribution. The first is that the license did not permit any distribution or transfer whatsoever: "the language of the license clearly states that the 'license is non-transferable.'" (ABD brief 14); "the use of the term nontransferable means nontransferable." (oral argument at 25min:33-37sec); "[a]bsent from the language the License, however, is any right to distribute the Designs." (ABD brief 15); "there is no question but that the License language does not permit distribution." *Id.* 18; "it is without question that the express language of the License prohibited the transfer of any duplication rights to any third party, including PDSI." *Id.* at 22; "[o]n it's face, the License did not grant any rights of distribution." *Id.* at 10. At the same time, it concedes that, despite the language on the face of the agreement, Raybestos had an "implicit right of distribution for the sole purpose of maintaining and repairing the machine," (oral argument at 1min:13-18sec) one that was not apparent from any language in the agreement, but solely from the extrinsic evidence. (ABD brief at 19, Reply brief at 11). In short, ABD simultaneously argues that "non-transferable means non-transferable"—period, but also states that there are exceptions to the prohibition of transferability. Raybestos' position, on the other hand, is that defining the scope of a permissible transfer is unnecessary as Raybestos never transferred or attempted to transfer the license to PDSI. (Appellee's brief at 27). Rather, the license applied to PDSI as Raybestos' agent. *Id.*

ABD counters that PDSI could not have been Raybestos' agent because the two parties signed an agreement which specifically defined their relationship as that of independent contractors and not agents. (R. at 97, Ex. 8). This puts too fine a point on it. We need not delve into a complex discussion of agency to understand the term as Raybestos uses it here. Raybestos hired PDSI "to act for or in place of" itself, as a representative. *See* Black's Law Dictionary, (8th ed. 2004) (defining "agent" as "[o]ne who is authorized to act for or in place of another; a representative."). Regardless of how the two parties chose to define their relationship for remuneration, tax, employment law, or tort liability purposes, for purposes of determining whether a transfer occurred, it seems clear that Raybestos simply hired PDSI to act in Raybestos' stead—using the design to create a machine that it likely did not have the capacity to create on its own. To see that Raybestos had the right to use the designs in this manner we need only look to a more clear-cut example. Take, for instance, Raybestos' right to duplicate the designs. All parties agree that this language clearly allowed Raybestos to make photocopies of the designs. If, however, Raybestos lacked the capacity to photocopy the designs on sight (if, for example, the designs were to large for an ordinary copier or needed to be reproduced in color), Raybestos could certainly take the designs to a Kinko's photocopy shop to have them copied. Similarly, if it lacked the capacity to manufacture parts on its own, it had the right to hire another to do so in its stead. It is true, as the dissent points out, that PDSI benefitted from having the designs. It benefitted in part, however, in the same way that Kinkos might benefit from being awarded a photocopy job. Additionally, of course, PDSI saved considerable time and expense by not having to reinvent the wheel. But again, had Raybestos opted to put engineers and manufacturers on its payroll to complete the job on its own, it would have saved considerable expense by having the designs rather than being forced to reverse engineer the

machine. The benefit of having the designs, therefore, was Raybestos' benefit—a benefit for which it paid. Without the designs, Raybestos would have had to start from scratch—a contingency it avoided by requiring access to the designs as a term of the agreement. The dissent would return this case to the district court for further proceedings to determine whether "PDSI's low bid on the replacement machine and its possession of the existing machine's designs was merely coincidental in the face of a reasonable inference to the contrary." Post at 25. As the above discussion demonstrates, however, the answer to that question is irrelevant. Once Raybestos secured the rights to duplicate the designs and "use the license" to duplicate machinery, it could hire another party to manufacture parts for it if Raybestos lacked the tools or skills to do so itself.

Allowing one's agent or contractor to use designs for one's own benefit is not a transfer. The definition of a transfer under the Copyright Act is not helpful in this context as it explicitly excludes from its definition non-exclusive licenses like the one in this case.[3] Other general definitions of "transfer," like the one from Black's Law Dictionary, are perhaps more helpful. Black's defines a transfer as "(1) [a]ny mode of disposing of or parting with an asset or an interest in an asset, including a gift, the payment of money, release, lease, or creation of a lien or other encumbrance . . . (2) Negotiation of an instrument according to the forms of law . . . (3) A conveyance of property or title from one person to another. " Black's Law Dictionary (8th ed. 2004). Surely Raybestos never intended to part with whatever license rights it had. Raybestos needed then, and likely

---

[3] "A 'transfer of copyright ownership' is an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license." 17 U.S.C. § 101.

needs today, the ability to use the designs to operate and maintain its machinery. Furthermore, PDSI signed a Secrecy and Confidentiality Agreement agreeing not to use any proprietary information it gained in its work with Raybestos for commercial use, so it has no continuing need or ability to use the license. (R. at 90, Ex. X).

The second sentence of the disputed agreement language further explains the parameters of what the parties intended to constitute a transfer. The license "is only for equipment to be used exclusively by RPC." In other words, the purpose of prohibiting a transfer was to prevent Raybestos or third parties from going into the clutch plate assembly business and selling such equipment to others. The license permitted Raybestos to employ the designs only for its own use—which is precisely what it did.

This conclusion—that no transfer occurred—wraps up all but one aspect of the copyright infringement claims in this case. ABD argues that although Raybestos could duplicate and manufacture parts of the machinery on its own, it could not duplicate the machinery as a whole. But once ABD admitted that Raybestos could duplicate parts of the equipment for maintenance and repair, this fight was over. For there is nothing in the contract language that would distinguish between copying and making derivative works for one or more parts, but not for the machine as a whole. And, as explained above, whatever rights Raybestos had to duplicate, it could hire PDSI to do so in its stead. The dissent argues that the right of duplication was limited to the "project" which the dissent claims was only the "first machine." Post at 23. From this the dissent concludes that "Raybestos's *implied* right of distribution should not extend beyond making spare and replacements parts for the first machine because ABD has not admitted such a right of distribution." *Id.* (emphasis ours). But this leap in logic works only if we grant ABD's request to interpret the contract to add such limiting language—that is if we accept

ABD's contention that the contract *implies* something that it does not say. And for the reasons described above, we cannot. Furthermore, the language points to the opposite result. If the license grants a right of duplication as it relates to the project, as the dissent states, and the project is defined as the first machine, then Raybestos had the right to duplicate the first machine in toto. The district court correctly granted summary judgment for Raybestos and PDSI on this copyright infringement claim.


**B.  <u>Revocation of the license.</u>**

Because Raybestos did not materially breach the license agreement, the district court was correct in determining that ABD could not revoke the license for breach of the agreement. (R. at 104, p. 11). We turn consequently to the only remaining question in this case—whether ABD could terminate the license at will.

Under Indiana law, a contract which provides no termination date is terminable at will by either party. *Rogier v. Am. Testing and Eng'g Corp.*, 734 N.E.2d 606, 616 (Ind. Ct. App. 2000); *Marksill Specialties, Inc. v. Barger*, 428 N.E.2d 65, 69 (Ind. Ct. App. 1981). Furthermore, state law governing contract termination does not conflict with and is therefore not pre-empted by the federal Copyright Act. *Walthal v. Rusk*, 172 F.3d 481, 485 (7th Cir. 1999). In other words, if a contract is terminable at will under Indiana law, nothing in the federal Copyright Act would prevent such a termination.

According to ABD, because the contract provided no termination date or fixed duration, ABD could terminate it at will. In support of its position it cites *Walthal,* which upheld the right of a musical group to cancel an oral contract of unspecified duration that gave a record distributor the nonexclusive right to manufacture and sell certain recordings in return for a fifty percent share of the

sales. *Id.* at 485-86. The *Walthal* court's task was to determine whether Illinois' common law allowing contracts of unspecified duration to be terminated at will conflicted with the Copyright Act's § 203 on termination which allows copyright holders to terminate the grant of a license after thirty-five years.[4] *Id.* at 483. The *Walthal* court concluded that it did not. *Id.* at 485. The Copyright Act allows a copyright holder to terminate the grant of a copyright after thirty-five years, but nothing in the act prevents parties from agreeing to a shorter period for termination or prevents the operation of state law allowing termination at will. *Id.* at 482, 484-85.

ABD points to *Walthal* as definitive support for its claim for the proposition that any copyright license of indefinite duration can be terminated at will. Because *Walthal* upheld a copyright grantor's right to terminate the license at will, even where the license holder had paid consideration for the license, the case certainly appears helpful to ABD's claim.

---

[4]    (a) Conditions for Termination.—In the case of any work other than a work made for hire, the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978, otherwise than by will, is subject to termination under the following conditions:

* * *

(3) Termination of the grant may be effected at any time during a period of five years beginning at the end of thirty-five years from the date of execution of the grant; or, if the grant covers the right of publication of the work, the period begins at the end of thirty-five years from the date of publication of the work under the grant or at the end of forty years from the date of execution of the grant, whichever term ends earlier.

17 U.S.C. § 203.

Regarding consideration and termination, however, *Walthal* says only: "Touch and Go presents two primary issues. The first is that the licensing agreement is irrevocable because consideration—the 50 percent share of the profits—was paid. This contention is without merit." *Walthal* 172 F.3d at 483. In essence, the *Walthal* court assumed that the contract was terminable at will under Illinois law and instead turned its attention to the question of whether Illinois or Federal Copyright law prevailed. In this case, however, we must answer the threshold question as to whether the contract at issue between the parties was terminable at will. And because this court looked more precisely at this particular question in *Baldwin Piano, Inc. v. Deutsche Wurlitzer GmbH*, 392 F.3d 881 (7th Cir. 2004), that trademark case provides more guidance for our analysis.[5]

After a reorganization in the Wurlitzer company, Baldwin Piano kept the piano and organ business and became the new parent company of the organization; Deutsche Wurlitzer GmbH, a jukebox manufacturer, was spun off to another firm but received a license to continue to use the famous "Wurlitzer" name on its jukeboxes and other products. *Id.* at 882. Eighteen years later, Baldwin Piano informed Deutsche Wurlitzer that the license was cancelled effective immediately. *Id.* The court, looking to the contractual termination language and the economic realities of the situation, held that the license could not be terminated at will. *Id.* at 886.

What both parties and the district court ignored, is that just like the parties in *Baldwin Piano*, but unlike the

---

[5] Trademark license contract disputes, just like copyright license disputes, are governed by the general rules of contract interpretation. 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 18:43, at 18-69 (2004).

parties in *Walthal*, the agreement between ABD and Raybestos did indeed contain a termination clause. Raybestos' June 24, 1999 Purchase Order, contained boilerplate language which allowed for termination due to default or at Purchaser's (Raybestos') convenience.[6] Both parties agree that this document, along with the June 21, 1999 offer letter from ABD formed the agreement between the parties. (R. at 97, p. 6); (Appellee's brief at 10-11). Although ABD describes the fine print of Raybestos' purchase order as boilerplate it makes no contention that it was not binding. *Cf. Prall v. Ind. Nat. Bank*, 627 N.E.2d 1374, 1378 (Ind. Ct. App. 1994) (holding a party to the terms of boilerplate language where he was a sophisticated party and did not contend that the boilerplate language was ambiguous or that he agreed to it under economic duress). In *Baldwin Piano*, the court looked at the contract's termination clause and determined that the enumerations in that clause were exclusive rather than illustrative and consequently prohibited any other form of termination including termination at will. *Baldwin Piano,*

---

[6]    TERMINATION: (a) Default. Purchaser may terminate this order or any part thereof by written notice if Seller fails to make deliveries or complete performance of services within the time specified or in accordance with agreed schedules . . . . (b) Purchaser's convenience. Purchaser may terminate this order for its convenience in whole or in part by written notice to Seller. In the event of such termination, Seller may claim its reasonable costs incurred prior to the effective date of termination plus a reasonable allowance for profit, all to be determined in accordance with generally accepted procedures, provided, however, that the local sum payable upon termination shall not exceed the order price reduced by payment previously made. If it appears that Seller would have sustained a loss on the entire order had it been completed, no profit shall be allowed . . . .

(R. at 90, Ex. N, pp. 3-4).

392 F.3d at 884. The *Baldwin Piano* court relied on an Illinois Supreme Court decision holding that a non-exclusive list of reasons for termination makes the term of the contract indefinite and permits termination at will. *Id.* (citing *Jesperson v. Minn. Mining and Mfg. Co.*, 700 N.E.2d 1014, 1016-17 (Ind. 1998)). Conversely, an exclusive list of reasons for termination prevents termination at will. *Id.* Although we do not have the same elucidation from the Indiana Supreme Court as the *Baldwin Piano* court had from the Illinois Supreme Court, a natural reading of the agreement terms in this case indicates that the parties have delineated the instances in which they anticipated permissible termination and that list appears to be exclusive rather than illustrative. Consequently, the language of the agreement supports an interpretation that the contract was not terminable at will. *See id.*

Similarly, the economic realities of the agreement favor treating the license as perpetual rather than terminable at will. *See id.* at 883. According to ABD, it gave Raybestos a very limited license to duplicate its designs. That license, it contends, would have allowed Raybestos to make photocopies of the designs or to use the designs to maintain and replace parts, but nothing more. Even accepting ABD's narrow construction of the license, it defies economic logic for Raybestos to enter into an agreement to purchase a machine where the license that allowed it to repair or maintain the machine could be revoked at any time. For if ABD revoked the license, then the first time a critical part broke or failed, the machine would have become essentially useless to Raybestos. "Businesses are not *compelled* to make sensible bargains, but courts should not demolish the economic basis of bargains that would be sound if the contract were given a natural reading." *Id.* at 883-84. Both the natural reading of the contract language and the nod to economic reality favor an interpretation that the license agreement was not terminable at will.

Looking further through a lens of economic sensibility, we note that, like the parties in *Baldwin Piano*, and unlike the parties in *Walthal*, these parties were not engaged in a long-term interactive arrangement. As the *Baldwin Piano* decision points out, the "terminable-at-will" doctrine was designed to allow businesses to part ways amicably where they had an ongoing long-term relationship that required coordination and agreement over a long period of time and where the relationship was no longer profitable for one or more parties. "Terminabllity means that, if the firms' goals or methods diverge, either side may get out." *Id.* at 885. But where, as here, the parties are not locked together in an ongoing relationship there is no sense in presuming that the parties intended to make their contract terminable at will, particularly where the language of the agreement, the nature of the license, and the economic realities dictate otherwise. *See id.* at 885-86. Consequently we find that the agreement was not terminable at will. We need not, therefore, delve into the dispute regarding whether Raybestos provided separate consideration for the license.

The judgment of the district court granting summary judgment and a declaratory judgment for Raybestos and PDSI is affirmed.

KANNE, *Circuit Judge*, dissenting. I am in substantial agreement with the thorough legal analysis of the majority, but the procedural approach required for a grant of summary judgment causes me to conclude that a reversal and remand is the proper course. Briefly, the following is my reasoning.

As the majority noted, it is likely there was a mistake in the drafting of the contract, however I disagree with the majority's conclusion that the mistake is immaterial. Not only does the addition of missing language serve to limit Raybestos's contractual rights, it has, in my view, the additional consequence of giving rise to a factual dispute.

The license agreement involved Raybestos's right, under the Copyright Act, to duplicate the designs for purposes stated in the contract. The license was silent both as to Raybestos's rights to distribute the designs and to make derivative works from the designs. There is no explicit right for Raybestos to provide the designs to anyone.

ABD concedes there is an implied right for Raybestos to distribute the designs for the limited purposes of repairing and maintaining the equipment. To that end, Raybestos could hire an agent to repair and maintain the equipment and provide the agent with the designs, but, as the majority correctly states, Raybestos could not "transfer" the designs to that agent without breaching the license agreement.

The majority concludes that the language of the contract does not limit the implied right of distribution to the production of individual parts rather than the machine as a whole. But the license granted the right of duplication only insofar "as it relates to this project." The "project," of course, was the first machine. In general, caution is used when implying rights in a contract and is done only insofar as necessary. *See Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1441-42 (7th Cir. 1992) (collecting authority). In this instance, Raybestos's implied right of distribution should not extend beyond making spare and replacement parts for the first machine because ABD has not admitted such a right of distribution. The nuances are irrelevant. Falling well outside the implied right is Raybestos's use of the designs to bid against ABD on a replacement machine, effectively permitting Raybestos to

enter the clutch plate assembly business. *Cf. Empire Gas Corp. v. American Bakeries Co.*, 840 F.2d 1333, 1337 (7th Cir. 1988) (noting that in a requirements contract, a buyer may not capitalize on a price rise by increasing his "requirements" in order to resell the goods at a profit and compete against the seller).

I believe it is a misconception in this case to determine that the right to duplicate the machine carries with it the right to use the designs to do the same thing. Patent law is the regime used to prevent duplication of the machine; as there was no patent, there is no bar to reverse engineering the machine. However, copyright law protects the designs, and I believe the use of the designs to make duplicate machines for sale to the buyer is not within the license.

In this case, PDSI was the agent Raybestos selected to service the machine, and PDSI was also a competitor of the licensor ABD. So long as PDSI acted in its capacity as an agent, and not as a competitor of ABD, Raybestos would remain within its implied right and there would be no "transfer" between Raybestos and ABD. The majority's opinion implicitly draws the appropriate line of demarcation: If PDSI did not obtain a tangible benefit—beyond compensation for its service as an agent—from possessing the designs, there was no "transfer."

In consonance with the settled principle that agents are bound to keep their principal's secrets, ABD and PDSI entered into a confidentiality agreement. The majority relies upon the existence of this contract to foreclose any "transfer" in this manner. However, on a summary judgment analysis it would seem necessary to leave open the possibility—and thereby acknowledge the existence of a genuine issue of material fact—of whether PDSI breached the confidentiality agreement by misappropriating the designs to reverse engineer the replacement machine for sale to Raybestos.

The record indicates PDSI did benefit from the plans and did enter the clutch plate assembly business. PDSI would have saved a considerable expense by using ABD's designs to reverse engineer a new machine rather than start from scratch. That PDSI took possession of the machine's designs and submitted the low bid for the replacement machine (lower than ABD's by $250,000), supports a reasonable inference that PDSI did just that. In addition, Raybestos stood to gain from any low bid, so long as ABD was kept in the dark.

It boils down to whether it is appropriate, on summary judgment, to determine that PDSI's low bid on the replacement machine and its possession of the existing machine's designs was merely coincidental in the face of a reasonable inference to the contrary. That contrary inference should have been taken in a light most favorable to the non-moving party—ABD. *See Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005) (citation omitted). There remains a genuine issue of material fact, and I would reverse the grant of summary judgment and remand for further proceedings. I, therefore, respectfully dissent.

A true Copy:

        Teste:

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*