# United States Court of Appeals
## For the First Circuit

No. 09-1096

ESTATE OF ROBERTO HEVIA ET AL.,

Plaintiffs, Appellants,

v.

PORTRIO CORPORATION ET AL.,

Defendants, Appellees.

No. 09-1097

ESTATE OF ROBERTO HEVIA ET AL.,

Plaintiffs, Appellees,

v.

HERIBERTO FIGUEROA-MARRERO ET AL.,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jaime Pieras, Jr., U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Selya, Circuit Judges.

Laura Beléndez-Ferrero, with whom Cristina Arenas-Solís and Ferraiuoli Torres Marchand & Rovira, PSC were on brief, for plaintiffs.

Adaljisa Pérez Andreu, with whom Adaljisa Pérez Andreu Law Office PSC was on brief, for defendants Valcarce, Sotelo, and their conjugal partnership.

Roberto O. Maldonado Nieves for defendants Figueroa-Marrero, his wife, and their conjugal partnership.

Fernando Van Derdys, with whom Law Offices of F. Van Derdys was on brief, for remaining defendants.

---

April 20, 2010

---

**SELYA**, **Circuit Judge**.  The late Roberto Hevia-Acosta (RHA) had a flair for architectural design.  The fruits of his labors survived him and led to a pitched legal battle that pitted his estate and heirs against his long-time business partner.  These appeals together comprise a chapter in the anthology of that litigation.  They require us to examine an arcane corner of the law: implied licenses to use copyrighted works.

The particular case at issue here began when RHA's estate (the Estate) and various members of his family — namely, his three children, Raúl Hevia-Macía, Roberto Hevia-Macía, and Vivian Hevia-Macía, and his widow, Florinda Macía — sued an array of defendants. The operative pleading is the second amended complaint.  In it, the plaintiffs alleged that the defendants infringed a copyright on architectural plans created by RHA.[1]  The defendants denied the plaintiffs' material allegations and counterclaimed.

The district court rejected both the copyright claim and the counterclaims, and it entered judgment without the imposition of any attorneys' fees or costs.  Following the court's supplementary order on a motion for reconsideration, both sides appealed.  Discerning no error or abuse of discretion, we affirm.

---

[1] The plaintiffs also pleaded a violation of moral rights. See P.R. Laws Ann. tit. 31, § 1401.  The district court deemed that claim preempted, and the plaintiffs have not appealed that ruling. Consequently, we treat their action as one for copyright infringement alone.

## I.   BACKGROUND

Because the absence of liability on the copyright claim was determined at the summary judgment stage, we rehearse the relevant facts in the light most favorable to the plaintiffs. See, e.g., Conward v. Cambridge Sch. Comm., 171 F.3d 12, 17 (1st Cir. 1999).

The main protagonists in this saga are RHA and his quondam business partner, Francisco Valcarce (FV). Over the course of roughly seven years, the men jointly participated in a host of real estate ventures. To bring structure to this sprawling enterprise, they formed three companies: Río Grande Development Corporation (RG Development), H.V. Development Corporation, and Jardines Mediterráneos Corporation. The partners owned equal equity interests in each of these companies.

The two men also worked out a division of corporate responsibilities. Under this arrangement, FV ran the business side of the enterprise and RHA took charge of design. As a part of RHA's duties, he devised the architectural concepts and created the plans used in the partners' development activities.

RHA and FV also shared the financial burden of the enterprise. As business partners, they would contribute equally to the capital needed to fund the acquisition of developable land. In addition, each man would personally guarantee loans made to finance their projects.

-4-

The project that lies at the epicenter of this case is Río Grande Village, a planned residential community in Río Grande, Puerto Rico. One of the partners' companies, RG Development, owned Río Grande Village. RHA worked on the architectural plans for the complex (the Hevia Plans). FV acknowledges that RG Development owed RHA approximately $150,000 for his work on the plans.[2]

RHA created the Hevia Plans in or around 1999. At some point thereafter, the Hevia Plans were sufficiently far advanced for RHA to authorize José Meléndez, an engineer, to incorporate them into his (Meléndez's) more advanced plans for the project.

In September of 2000, Meléndez signed and sealed the proposed plans for Río Grande Village.[3] They were then submitted to a governmental agency.

RHA and his wife, Florinda Macía, were the grantors of Fideicomiso Hevia-Macía (the Trust), a trust established under Puerto Rico law. Their children, Raúl, Roberto, and Vivian, were the principal beneficiaries. On January 11, 2003, RHA donated to the Trust all his shares and interests in the three companies that he and FV had formed. Two days later, RHA died.

---

[2] The second amended complaint does not contain a claim for this indebtedness.

[3] Meléndez was a fully licensed engineer. RHA, though experienced in drafting architectural plans, was not licensed as either an architect or an engineer.

On December 31, 2003, the Trust sold the stock to FV for $4,000,000. FV became, with this purchase, the sole shareholder of all three companies, including RG Development. The purchase-and-sale agreement (the Agreement) between the Trust and FV does not mention the Hevia Plans. It does, however, purpose to convey to FV "every interest" that the Trust may have in each of the companies.

After the consummation of this transaction, RG Development sold the land that had been earmarked for the Río Grande Village project to two entities, Portrio Corporation and MDY Corporation. These entities were sister corporations: FV and three of his offspring, including José Valcarce, were the shareholders of each.

To assist in developing the project, Portrio and MDY retained specialists to prepare plans, obtain permits, and manage construction. In this regard, they contracted with Diseñadores Asociados, Corp., whose president, Carlos Iván de León, hired Heriberto Figueroa-Marrero (Figueroa) to work on the plans for Río Grande Village. Portrio, MDY, and their agents ultimately used the Hevia Plans for the development of two residential complexes on the Río Grande Village site.

During the period between RHA's death and the Trust's sale of the stock, some communications took place among RHA's heirs, on the one hand, and José Valcarce and De León, on the other hand. Between February and June of 2003, De León requested

-6-

permission from Raúl Hevia-Macía to use the Hevia Plans.  On June 17, Raúl signed a document granting De León authority to make use of plans prepared by RHA for any commercial or business purpose. In October, however, Roberto Hevia-Macía wrote separate letters to De León and José Valcarce, in which he stated that he owned the architectural plans being used in the construction of certain residential projects.  In the same time frame, he wrote a letter making similar claims to the Administration of Regulations and Permits of Puerto Rico.

Later that month, Raúl sent a letter to De León in which he referred to his brother's withdrawal of permission to use the plans and stated that such permission would pertain only to projects authorized by the Estate.  Raúl's earlier letter had been sent without that imprimatur.

On February 20, 2004, the plaintiffs filed three separate actions in the Puerto Rico Superior Court against the three companies that RHA and FV formed and some of the instant defendants.  They alleged that these companies owed RHA money for loans extended and services rendered.  There is no information in the record as to the outcome of these three cases.

We fast-forward to March 30, 2007, when the plaintiffs submitted a copyright application for the Hevia Plans.  See 17 U.S.C. § 409.  In their application, they claimed that the Hevia Plans were created by RHA in 2001, as an original work.

Two other facts are worth noting. First, the plaintiffs acknowledge that the plans were intended by their creator for the construction of Río Grande Village. Second, it is undisputed that the plans, with De León's modifications, were devoted to construction at the location that had been intended all along as the site of Río Grande Village.

## II.  TRAVEL OF THE CASE

On May 1, 2007, the plaintiffs commenced this federal court suit, alleging copyright infringement. 17 U.S.C. § 501. In their second amended complaint, filed on July 18, 2007, they named as defendants (excluding persons and firms either not served or voluntarily dismissed): FV, his wife, their conjugal partnership, Portrio, MDY, José Valcarce, his wife, their conjugal partnership, Figueroa, his wife, and their conjugal partnership. The defendants answered and counterclaimed for damages, alleging that the plaintiffs' action was both frivolous and maliciously prosecuted.

In due season, the plaintiffs and defendants filed cross-motions for summary judgment with respect to the copyright claim. The district court denied the plaintiffs' motion and granted the motions of some defendants. Estate of Hevia-Acosta v. Portrio Corp., No. 07-1363, slip op. at 27 (D.P.R. July 29, 2008). In its rescript, the court opined that the plaintiffs' claim lacked merit because, as matters of undisputed fact, (i) RHA had granted an implied nonexclusive license to RG Development authorizing a limited

use of the Hevia Plans, and (ii) FV had acquired the right to use this license when he purchased the remaining shares in RG Development from the Trust. Id. at 16. At the same time, the court, acting sua sponte, dismissed the defendants' counterclaims with prejudice. Id. at 27. The court then entered judgment in favor of all the defendants on the copyright claim, and entered judgment in favor of the plaintiffs on the counterclaims. The judgment was entered without awarding either attorneys' fees or costs to any party.

The defendants moved to alter or amend the judgment. Fed. R. Civ. P. 59(e). The district court granted this motion in part, modifying its dismissal of the counterclaims to operate without prejudice. That ruling is not challenged here. In all other respects, it denied the motion to alter or amend. This included, but was not limited to, a denial of the defendants' request that attorneys' fees and costs be assessed against the plaintiffs. These timely appeals ensued.

## III. ANALYSIS

On appeal, the plaintiffs challenge the district court's disposition of the cross-motions for summary judgment. By means of their cross-appeal, the defendants challenge the court's refusal to award attorneys' fees and costs against the plaintiffs. We address these claims of error sequentially.

## A.  **The Copyright Claim**.

We review orders granting or denying summary judgment de novo, considering the record and all reasonable inferences therefrom in the light most favorable to the non-moving parties. See Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 183-84 (1st Cir. 1999).  Where, as here, a district court rules simultaneously on cross-motions for summary judgment, it must view each motion, separately, through this prism.  See Blackie v. Maine, 75 F.3d 716, 721 (1st Cir. 1996).  A district court may enter summary judgment only if the record, read in this manner, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Houlton Citizens' Coal., 175 F.3d at 184; see also Fed. R. Civ. P. 56(c).

The plaintiffs argue that the record fails to show, with the requisite conclusiveness, that RHA granted an implied nonexclusive license to RG Development.  Their fallback position is that, if such a license was granted, the record fails to establish that the license remained in force, that FV acquired the right to use it, or that his use was within the license's scope.  For ease in exposition, we separate the components of this argument.

**1.  The License.**[4]  It is a bedrock principle that copyright ownership can be transferred by operation of law (as may occur in, say, a probate or bankruptcy proceeding) or by a writing signed by the copyright owner.  See 17 U.S.C. § 204; John G. Danielson, Inc. v. Winchester-Conant Props., Inc., 322 F.3d 26, 40 (1st Cir. 2003).  Short of a transfer of ownership, a nonexclusive right to use a copyright may be granted by the copyright owner. This may occur by the granting of a written license.  See, e.g., Jacobsen v. Katzer, 535 F.3d 1373, 1380 (Fed. Cir. 2008).  It also may occur without any particular formality, as by conduct manifesting the owner's intent.  See Danielson, 322 F.3d at 40. This kind of implied license is, by definition, of limited scope; it "simply permits the use of a copyrighted work in a particular manner."  I.A.E., Inc. v. Shaver, 74 F.3d 768, 775 (7th Cir. 1996). Uses of a copyrighted work that stay within the bounds of an implied license do not infringe the copyright.  Danielson, 322 F.3d at 40.

We do not mean to suggest that implied licenses are an everyday occurrence in copyright matters.  The opposite is true: implied licenses are found only in narrow circumstances.  Id. When, as in this case, an implied license is asserted as a defense to

_____

[4] For purposes of our analysis we assume without deciding that RHA had a valid and copyrightable interest in and to the Hevia Plans, and that his interest passed to the Estate by operation of law upon RHA's death.

infringement, the burden of proving its existence rests on the proponent. Id.

"The touchstone for finding an implied license . . . is intent." Id. We ask whether "the totality of the parties' conduct indicates an intent to grant such permission." 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 10.03[A][7], at 10-42 (2000). The test most commonly used in determining if an implied license exists with respect to most kinds of works asks whether the licensee requested the work, whether the creator made and delivered that work, and whether the creator intended that the licensee would copy and make use of the work. Nelson-Salabes, Inc. v. Morningside Dev., LLC, 284 F.3d 505, 514 (4th Cir. 2002).

We previously have noted that, in cases involving whether an architect has by conduct granted an implied license, courts "quickly pass over the 'request' and 'delivery' issues to focus on manifestations of the architects' intent that plans may be used on a project without their involvement." Danielson, 322 F.3d at 41. With an intensity that varies with the facts of the particular case, courts have deemed it useful to consider a number of factors, including

> (1) whether the parties were engaged in a short-term discrete transaction as opposed to an ongoing relationship; (2) whether the creator utilized written contracts . . . providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the

> creation or delivery of the copyrighted
> material indicated that use of the material
> without the creator's involvement or consent
> was permissible.

Id. (quoting Nelson-Salabes, 284 F.3d at 516). This list is not exhaustive and, in the last analysis, the copyright owner's intent is the touchstone for determining whether such an implied license has been granted. Id. at 40.

In this case, the evidence that RHA granted to RG Development an implied nonexclusive license to use the Hevia Plans to develop Río Grande Village is compelling. The undisputed facts and all three Nelson-Salabes factors point in this direction.

At first blush, the initial Nelson-Salabes factor might seem to cut the other way. After all, RHA's seven-year partnership with FV, which encompassed his work on Río Grande Village, constitutes an ongoing relationship — and courts sometimes treat the existence of an ongoing relationship as a factor weighing against the implication of a license. See, e.g., id. at 41; Foad Consulting Group v. Musil Govan Azzalino, 270 F.3d 821, 828-32 (9th Cir. 2001); I.A.E., Inc., 74 F.3d at 776-77. The plaintiffs invite us to draw a similar inference here.

A closer look at the facts impels us to decline the invitation. The cases underlying the plaintiffs' position all involve the arms-length negotiation of a particular transaction, resulting in a relationship between an architect and a person who subsequently claims to have acquired an implied license. See, e.g.,

-13-

Danielson, 322 F.3d at 41. That framework does not fit this case, in which the protagonists were partners, and the architect was not an independent contractor simpliciter but an owner of the entity that allegedly received the implied license. In a scenario in which the architect is an owner, an ongoing relationship can cut in favor of a finding that an implied license exists. This case fits that mold.

The evidence makes it pellucid that the relationship among RHA, FV, and RG Development had a single overarching goal: the development of Río Grande Village. RG Development was owned one-half by RHA and one-half by FV. Thus, both men stood to gain from the seamless completion and eventual success of the project. To this end, each man made a valuable contribution: RHA contributed his architectural talents (which yielded the copyrighted work) and FV contributed his financial and managerial expertise (which made the numbers work).

RHA's intentions about the granting of a license must be viewed against this entrepreneurial backdrop. Because the very essence of RHA's ongoing relationship with FV and RG Development was founded on the successful consummation of the project (which necessitated RG Development's use of the Hevia Plans), that relationship weighs in favor of finding an intent on RHA's part to grant a license to RG Development.

We need not linger long over the second Nelson-Salabes factor. The plaintiffs concede that there is no evidence of an agreement limiting the use of the Hevia Plans to instances in which RHA either gave express permission or remained personally involved in the work. Thus, this factor favors a finding of an implied license. See Nelson-Salabes, 284 F.3d at 516.

The third Nelson-Salabes factor also tilts toward finding an implied license. The evidence as to how the defendants came to have the plans reinforces the notion that RHA intended to grant a license. In contrast with the scenario in Danielson, the plans did not come from a third party but, rather, went directly from RHA to the other principal and the engineer working with the two principals.[5]

Above and beyond these three factors, RHA's overall course of conduct speaks directly and unequivocally to his intent that the Hevia Plans be used to develop Río Grande Village. He created the plans for that very purpose; and, as far back as 2000, gave permission to an engineer, Meléndez, to incorporate them into Meléndez's more elaborate blueprints for the project. The inference is inescapable that RHA expected all along that Meléndez's work

---

[5] If it is true, as the plaintiffs assert, that FV (who managed RG Development) gave Portrio and MDY access to the Hevia Plans, then it stands to reason that he already had them in his possession.

product would serve as the basis for obtaining the permits needed to move forward with the proposed development.

What happened next confirms RHA's manifest intent. In September of 2000, the completed blueprints, which incorporated the Hevia Plans, were signed and sealed, and they were then submitted to the appropriate governmental agency. RHA must have anticipated that filing. It was made by Río Grande Village, and RHA was not only a principal of the company but also the person in charge of project design. These actions, taken in conjunction with the three Nelson-Salabes factors, conclusively establish that RHA intended the Hevia Plans to be used for the development of Río Grande Village.

That ends this aspect of our inquiry. Because there is no significantly probative evidence to contradict this manifest intent, there is no trialworthy issue as to the existence of the implied license. Consequently, the district court did not err in concluding that RHA granted RG Development an implied license to use the Hevia Plans to develop Río Grande Village.

2. **Revocation**. The plaintiffs attempt to confess and avoid. They contend that even if an implied license did exist, the Estate revoked it. This contention lacks merit.

The argument for revocation relies on letters from Roberto Hevia-Macía and Raúl Hevia-Macía, respectively. But none of the letters purports to prohibit the defendants from using the Hevia Plans to develop Río Grande Village. At most, the letters

-16-

represent an effort to prohibit De León and José Valcarce from using the Hevia Plans for a different development — the Arco Baleno project. To prove this point, we parse the correspondence.

We start with the letter from Roberto Hevia-Macía to De León under date of October 12, 2003. By its terms, this letter was sent "to confirm" a telephone conversation about the Arco Baleno project, in which Roberto complained that the Hevia Plans were "being submitted to build" 32 units at Arco Baleno. With the stage set in this manner, the letter warns that "in no way are you or anybody else authorized to use . . . the blueprints that were used to build the project[] of . . . Río Grande Village."

Roberto's next letter, under date of October 14, 2003, is addressed to José Valcarce. It states that "[i]t has come to my attention that you are hiring some professionals to use my blueprints, which are being submitted to build a 32 unit project [known as Arco Baleno]." This letter contains a prohibition similar to that contained in the October 12 letter.

Read in their proper context, these letters purpose to forbid the use of the Hevia Plans for the Arco Baleno project, not for Río Grande Village.

Roberto's letter of October 14, 2003, to the Regulations and Permits Administration of Puerto Rico, solidifies this interpretation. That letter — a copy of which was sent to José Valcarce — states:

> I wish to inform you that the [Arco Baleno] project is being submitted with blueprints whose design belongs to me and which have been used without my permission.
>
> The blueprints have been used before in my projects of . . . Río Grande Village and many others under my supervision, but at this time they want to violate my copyrights.

This language unmistakably draws a distinction between the (permissible) use of the plans for Río Grande Village and their (unauthorized) use for Arco Baleno.

The next letter is from Raúl Hevia-Macía to De León under date of October 28, 2003. It characterizes the October 12 letter as "forbidding any use of the blueprints in the project known as Arco Baleno," and notes that the Estate forbids any use of the blueprints "without prior authorization."

The last letter is from Roberto Hevia-Macía to José Valcarce under date of January 23, 2004. It proclaims that the recipient "ha[s] not been authorized to use . . . the design of the project[] . . . of Río Grande Village" for a different project.

For purposes of their revocation argument, the plaintiffs are bound by the text of the letters that they generated. None of these letters were sent either to FV or to RG Development. In any event, they cannot plausibly be interpreted as revoking an implied license granted to RG Development for use in constructing Río Grande Village. The revocation argument is, therefore, futile.

-18-

**3. Control and Scope**. We turn next to the plaintiffs' assertion that the district court erred in concluding that, as matters of undisputed fact, (i) FV acquired the right to use the Hevia Plans through his purchase of the outstanding shares in RG Development; and (ii) thereafter acted within the scope of the license. At the outset, this inquiry requires us to consider the Agreement and the transaction that it memorialized.

The parties to the Agreement are FV and the Trust. The relevant provision of the Agreement declares that the parties "have reached an agreement through which the Trust sells to [FV] every interest it has in the Corporations" for the price of $4,000,000. "Corporations" is a defined term that encompasses RG Development.

Plainly, the overall effect of the transaction is to make FV the sole owner of the three affected companies, including RG Development. That company enjoyed an implied nonexclusive license to use the Hevia Plans for the purpose of developing Río Grande Village, and that implied license was granted long before the execution of the Agreement. See supra Part III(A)(1). The acquisition of RHA's shares, combined with FV's role as the chief executive officer of the company, make it difficult to imagine who, other than FV, would be entitled to exercise the license. It follows that FV controlled the license on behalf of RG Development.

That control was, of course, limited by the scope of the license. See I.A.E., Inc., 74 F.3d at 775. So viewed, the relevant

-19-

question reduces to whether FV, acting for the license holder, observed those limits.

The limits are easily described. As explained above, RHA intended to restrict the license to use the Hevia Plans to the creation of Río Grande Village. The defendants' use of the Hevia Plans comported with this circumscription: the uncontested facts show that the plans were used only at the intended location and for the intended purpose. The only conclusion that we can draw is that FV acted within the scope of the implied nonexclusive license (and, thus, did not infringe the plaintiffs' copyright).

In an effort to blunt the force of this reasoning, the plaintiffs note that FV did not use the Hevia Plans himself but, rather, enlisted Portrio and MDY to complete the actual work. In our view, this enlistment of third parties does not transmogrify a non-infringing use into an infringing use.

To begin, the work undertaken by Portrio, MDY, and their agents is within the scope of RG Development's implied license because it was limited to the development of Río Grande Village. There is no evidence that RHA intended to restrict RG Development's ability to engage outside contractors to accomplish the goal of completing Río Grande Village. Furthermore, given RHA's equity interest in RG Development, such a restriction would seem counter-intuitive. Indeed, it would contradict the very reason for granting the license in the first place.

-20-

When, as in this case, there is no indication that a license-granting copyright owner has restricted the licensee's ability to use third parties in implementing the license, the license is generally construed to allow such delegation. See, e.g., Automation by Design, Inc. v. Raybestos Prods. Co., 463 F.3d 749, 756-58 (7th Cir. 2006) (holding that copyright licensee acted within the scope of nontransferable license to a manual for a machine when it hired a third party to use the manual to build the machine on the licensee's behalf); see also Raymond T. Nimmer & Jeff Dodd, Modern Licensing Law § 6:19 (2009).

The plaintiffs muster two other arguments. First, they asseverate that the Trust could not have transferred the right to use the Hevia Plans to FV because the Estate, not the Trust, owned the not-yet-copyrighted work. This asseveration conflates the transfer of copyright ownership with the transfer of shares in a company that holds a license to use a copyrighted work.

Assuming, without deciding, that the Estate owned the not-yet-copyrighted work, see supra note 4, the Trust indisputably owned the RG Development stock formerly owned by RHA. Thus, the Trust had the right to sell those shares (and with them, control over the assets of RG Development, including the implied license). The Trust did exactly that.

Second, the plaintiffs suggest that RG Development had no right to transfer its nonexclusive license to third parties like

Portrio and MDY. This suggestion rests on an incorrect premise: RG Development did not purport to transfer its license to Portrio or MDY. Although RG Development sold the land upon which the project was to be built, there is no evidence that this sale included the license. Nor can such a transfer be inferred from the fact that Portrio and MDY performed the work required to develop the project, using the Hevia Plans. See Automation by Design, 463 F.3d at 758 ("Allowing one's agent or contractor to use [copyrighted] designs for one's own benefit is not a transfer [of copyright ownership].").

This ends our discussion of the copyright claim. We conclude that the court below did not err in granting summary judgment for the defendants on that claim.

## B. **Attorneys' Fees and Costs**.

In their cross-appeal, the defendants make no claim for fees based either on a statute or a contractual provision.[6] Rather, they argue that the district court should have affirmatively exercised its inherent power to assess attorneys' fees and costs against the plaintiffs. This argument is unavailing.

**1. Attorneys' Fees**. In the absence of a fee-shifting statute or contractual provision, civil litigants in the federal courts ordinarily are responsible to pay the fees of their own counsel. Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S.

---

[6] Although the Copyright Act contains a fee-shifting provision, see 17 U.S.C. § 505, the defendants do not invoke it.

-22-

240, 247 (1975); <u>Gay Officers Action League</u> v. <u>Puerto Rico</u>, 247 F.3d 288, 293 (1st Cir. 2001). But this rule, like every general rule, admits of exceptions. One such exception implicates the inherent power of a federal district court to award attorneys' fees against a litigant who has acted in bad faith. <u>See</u> <u>Chambers</u> v. <u>NASCO, Inc.</u>, 501 U.S. 32, 45 (1991); <u>Jones</u> v. <u>Winnepesaukee Realty</u>, 990 F.2d 1, 4 (1st Cir. 1993).

Espousing this doctrine, the defendants asked the district court to award them attorneys' fees. The court demurred. The defendants now appeal, asserting that the district court abused its discretion by failing to order such an impost. The defendants stress that the plaintiffs filed a total of four separate lawsuits arising out of a single nucleus of operative facts. More importantly, the plaintiffs, as the defendants see it, commenced the instant action without a sound basis in law or fact.

We can be brief. Although, in theory, the bringing of multiple lawsuits in rapid-fire succession against a defendant or group of defendants could well be relevant to a claim of bad faith, the district court did not abuse its discretion in this case by deciding not to award fees against the plaintiffs. After all, the complaints in the cases filed in the local court (which were proffered before the district court) did not concern the copyright dispute in any way.

This narrows the focus of our inquiry to the copyright infringement claim asserted in the case at hand. As to that claim, the primary defense was that RHA, through his actions, had impliedly granted a nonexclusive license that shielded the defendants from infringement liability. Although this defense carried the day, the case law teaches that an implied license is found only in narrow circumstances. See Danielson, 322 F.3d at 40. Given the facts of record, the plaintiffs hardly can be faulted for putting the defendants to their proof on this issue. That being so, it would be quixotic for us to infer bad faith from the mere fact that the plaintiffs chose to sue and lost. See, e.g., Roselló-González v. Acevedo-Vila, 483 F.3d 1, 6 (1st Cir. 2007); Herman v. Cent. States, S.E. & S.W. Areas Pension Fund, 423 F.3d 684, 695-96 (7th Cir. 2005).

In all events, district courts have broad discretion in determining when and whether to exercise inherent powers, particularly with respect to fee-shifting on account of a party's supposed bad faith. See Chambers, 501 U.S. at 45-46; Jones, 990 F.2d at 4. There is simply no principled way that we can hold, on this chiaroscuro record, that the district court abused its discretion in refusing to assess attorneys' fees against the plaintiffs.

2. **Costs**. The defendants sought costs as well as attorneys' fees. The district court did not oblige. We discern no abuse of discretion in this ruling.

While there is a general presumption favoring the recovery of court costs by prevailing parties, see Fed. R. Civ. P. 54(d)(1); In re San Juan Dupont Plaza Hotel Fire Litig., 994 F.2d 956, 962 (1st Cir. 1993), both sides prevailed here; the defendants prevailed on the copyright infringement claim, but the plaintiffs prevailed on the counterclaims (which asserted, in substance, abuse of process on account of frivolousness). Just as the plaintiffs failed to prove infringement, the defendants failed to prove frivolousness — and the fact that the district court dismissed the counterclaims without prejudice does not alter the fact that the counterclaims were dismissed.

In situations in which one party prevails on some claims and the other party prevails on other claims, the litigants are commonly ordered to bear their own costs. See, e.g., Kropp v. Ziebarth, 601 F.2d 1348, 1358 n.27 (8th Cir. 1979); Srybnik v. Epstein, 230 F.2d 683, 686 (2d Cir. 1956). In most instances, this is a sensible practice. And although the district court surely could have awarded costs to the defendants notwithstanding the dismissal of the counterclaims, the fact that the defendants' pursuit of the counterclaims was unsuccessful buttresses the case for upholding the denial of costs.

At any rate, the presumption favoring an award of costs to a prevailing party is weaker in cases involving close questions. Thus, a district court ordinarily does not abuse its discretion by

denying court costs to a prevailing party in such a case.  See, e.g., B. Fernández & Hnos., Inc. v. Kellogg, Inc., 516 F.3d 18, 28 (1st Cir. 2008).  As discussed above, a finding of an implied license is rare and, on the facts of this case, such a finding required careful application of a myriad of relevant factors.  Viewing the case against this backdrop, we hold that the district court did not abuse its discretion in not awarding costs to the defendants.[7]

**IV.  CONCLUSION**

We need go no further.  For the reasons elucidated above, we leave the parties exactly where we found them.

**Affirmed**.  **All parties shall bear their own costs**.

---

[7] To be sure, a district court normally should state its reasons for denying costs.  See In re San Juan Dupont Plaza, 994 F.2d at 963.  Although the court below did not offer an explicit rationale for denying costs, it did offer reasons for denying attorneys' fees.  Those reasons apply with equal force to the question of costs.  Where, as here, the reasons for denying costs are sufficiently clear, the absence of a specific explanation is not fatal.  See id.