# United States Court of Appeals
## For the First Circuit

No. 19-1452

PHOTOGRAPHIC ILLUSTRATORS CORPORATION,

Plaintiff, Appellant,

v.

ORGILL, INC.,

Defendant, Appellee,

FARM & CITY SUPPLY, LLC,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Howard, Chief Judge,
Lynch and Kayatta, Circuit Judges.

Charles E. Fowler, Jr., with whom Gary Cruciani, McKool Smith, PC, Craig R. Smith, Eric P. Carnevale, and Lando & Anastasi, LLP were on brief, for appellant.
Virginia H. Snell, with whom Byron E. Leet, Thomas E. Travis, Wyatt, Tarrant & Combs, LLP, James F. Radke, and Murtha Cullina LLP were on brief, for appellee.

March 13, 2020

**KAYATTA**, <u>Circuit Judge</u>.  In this case of first impression in the circuit courts, we hold that a copyright licensee given the unrestricted right to grant sublicenses may do so without using express language.

## I.

Photographic Illustrators Corp. ("PIC") provides commercial photography services -- primarily photos of consumer goods -- through its principal photographer, Paul Picone.  Osram Sylvania, Inc. ("Sylvania") is one of the world's leading manufacturers of lightbulbs.  PIC owns valid copyrights to thousands of photographs of Sylvania lightbulbs.  Sylvania uses the photos in marketing and selling its products, as do Sylvania's dealers and distributors.

After a dispute arose between PIC and Sylvania concerning the scope of Sylvania's permission to use the photos, PIC and Sylvania negotiated a detailed, sixteen-page license setting forth the precise terms of the parties' agreement.  The license was to be effective from 2006 to 2012.  For present purposes, the key provision in the license concerns the use of the photos by those dealers and distributors who market and sell Sylvania products.  That provision states as follows:  "PIC (and, to any extent necessary, Paul Picone) hereby grants [Sylvania] a non-exclusive, worldwide license in and to all the Images and the copyrights thereto to freely Use, sub-license Use, and permit Use,

in its sole and absolute discretion, in perpetuity, anywhere in the world." Sylvania paid PIC approximately $3 million in consideration for this license. The license also stipulated that, "[t]o the extent reasonably possible and practical, [Sylvania] shall . . . include a copyright notice indicating PIC as the copyright owner and/or include proper attribution indicating Paul Picone as the photographer," including "as a side note or footnote for Images appearing in published advertisements." We refer to this requirement in the license as the "attribution restriction."

Orgill, Inc., a global hardware distributor, is one of those third parties that markets and sells Sylvania lightbulbs through a network of dealers. Orgill's inventory includes nearly 1,000 Sylvania products. At issue here is Orgill's use of PIC photos of Sylvania lightbulbs in Orgill's electronic and paper catalogs. As best the record shows, it would have been unrealistic to try to market and sell the lightbulbs without pictures of the product. To obtain those pictures, Orgill's catalog editor, Dennis Sills, told Sylvania which photos Orgill wanted to use. Sylvania then sent the photos to Sills, who used them as he told Sylvania he would. On occasion, instead of sending the photos to Sills in response to his requests, Sylvania directed him to copies of the photos maintained on Sylvania's website from which Sills then cut and pasted copies for Orgill's use.

Sylvania did not tell Orgill (or other Sylvania customers) that Orgill needed to abide by the attribution restriction in Sylvania's license. Deeming this omission to violate the PIC-Sylvania license, PIC commenced more than thirty separate lawsuits against Orgill and other Sylvania dealers and distributors. A number of those actions filed in the District of Massachusetts (not including this one) were consolidated, with Sylvania intervening as an interested party. The district court, with the consent of the parties, referred those consolidated cases to arbitration. Sylvania also moved to intervene in the present, unconsolidated case lodged by PIC against Orgill and one of Orgill's dealers, Farm & City Supply, LLC ("Farm & City"). The district court denied that motion.

PIC's claims against Orgill and Farm & City included copyright infringement under 17 U.S.C. § 501, violations of the Digital Millennium Copyright Act (DMCA), and false designation of origin and false advertising under the Lanham Act. The district court granted the defendants' motion for summary judgment as to the DMCA and Lanham Act claims. See Photo. Illust'rs Corp. v. Orgill, Inc. ("PIC I"), 118 F. Supp. 3d 398, 408, 410-11 (D. Mass. 2015). As to the copyright claim, the court determined that Orgill had a sublicense from Sylvania to use the photos. Id. at 403. Left unresolved by that ruling on summary judgment was the scope of that sublicense and whether Orgill exceeded it. Id. at 403-

- 4 -

05.  The court also found Farm & City to be an innocent infringer. Id. at 406.  At that point, PIC dropped Farm & City from the case, and the court granted the parties' motion to stay proceedings pending the outcome of the arbitration.

Thereafter, the arbitrator issued a partial final award in the dispute between PIC, Sylvania, and the non-Orgill distributors.  A key ruling in that decision framed the remainder of this litigation.  The arbitrator construed the attribution restriction in Sylvania's license to be a "covenant," rather than a "condition."  This matters because a licensee who violates a condition of a license (and thus exceeds the license's scope) cannot claim the license as a defense to copyright infringement, but if the licensee merely violates a covenant, the licensor's only remedy is for breach of contract.  See MDY Indus., LLC v. Blizzard Entm't, Inc., 629 F.3d 928, 939 (9th Cir. 2010); Graham v. James, 144 F.3d 229, 236 (2d Cir. 1998).  The arbitrator went on to determine that Sylvania breached this covenant by permitting its distributors to reproduce PIC's photos without attribution. As compensation for that breach, the arbitrator awarded PIC approximately $8.5 million.  As to the other distributors, the arbitrator briefly noted -- apparently based on a concession by PIC -- that they had sublicenses from Sylvania, so the arbitrator awarded no damages from those parties.

- 5 -

Following the arbitrator's decision, Orgill renewed its motion in this case for summary judgment on the sublicense defense and on the new ground of defensive, nonmutual issue preclusion. The district court held that the arbitral award precluded PIC from relitigating the arbitrator's construction of the PIC-Sylvania license, including the finding that the license permitted Sylvania to grant "implied sublicenses" to its distributors. See Photo. Illust'rs Corp. v. Orgill, Inc. ("PIC II"), 370 F. Supp. 3d 232, 243-44 (D. Mass. 2019). The district court viewed that finding as implicitly assuming that a copyright sublicense could be implied in the absence of an express grant. Id. at 244. Nevertheless, because the parties to the arbitration did not raise and contest that assumption, the district court allowed PIC to argue in this case that, as a matter of law, sublicenses of copyrights are ineffective absent language expressly granting permission to use the copyrighted work. Id. Having allowed PIC to make that argument, the district court then rejected it. Id. at 245-47. The district court also reaffirmed its prior ruling that Sylvania impliedly granted Orgill a sublicense and then construed the scope of that sublicense as having an attribution restriction that was merely a covenant, not a condition. Id. at 244-45, 247-49. Accordingly, PIC could not recover from Orgill for copyright infringement. Nor could PIC recover on a contract theory because

Orgill made no promise to PIC.  The court thus granted full summary judgment in favor of Orgill.  Id. at 251.  PIC timely appealed.

**II.**

We begin by narrowing the scope of the issues before us. This is not a case in which there is any contention that Orgill acquired ownership of PIC's copyrights.  Hence the provision of the Copyright Act that such a transfer of ownership must be in writing is not at issue.  See 17 U.S.C. § 204(a) ("A transfer of copyright ownership . . . is not valid unless an instrument of conveyance . . . is in writing and signed by the owner of the rights conveyed."); see also id. § 101 (defining "transfer of copyright ownership" to exclude "nonexclusive license[s]").  Nor does PIC argue that Sylvania could not orally grant Orgill effective permission to use the photos.

Instead, on appeal PIC makes two more narrowly tailored arguments.  First, PIC argues that any sublicense of the right to use a copyrighted work must as a matter of law be "express," and that here Sylvania's permission to Orgill was at most implied. Second, PIC argues that even if a jury might find an express grant of permission in this case, or even if an implied grant is sufficient, there are issues of fact that would allow a jury to

find that Orgill obtained no permission, either express or implied. We address each argument in turn.[1]

### A.

PIC frames its first argument by claiming that an implied sublicense is a legal impossibility. We will assume without deciding that, as the district court determined, the arbitral award does not preclude PIC from making this argument. See PIC II, 370 F. Supp. 3d at 244 (deciding that the issue was not "actually litigated" in arbitration).

Nothing in the Copyright Act requires that two parties' agreement to a sublicense be expressed in any specific language. And no circuit court has ever addressed whether such a requirement exists. In fact, it appears that only one other district court besides the court below has ever published an opinion considering an implied copyright sublicense. See Catalogue Creatives, Inc. v. Pac. Spirit Corp., No. CV 03-966-MO, 2005 WL 1950231, at *2 (D. Or. Aug. 15, 2005) (calling an implied sublicense granted from an implied licensee a "legal impossibility"). So we are for the most part in uncharted waters.

To find our way, we consider first how the common law treats the making of a license itself between the owner and the

_____

[1] PIC does not appeal the district court's ruling that Orgill cannot be held liable to PIC for any breach of the attribution restriction in Sylvania's license. PIC also does not appeal the district court's earlier rulings on the DMCA and Lanham Act claims.

- 8 -

original licensee.  Both parties presume that federal common law applies, so we shall as well.  See Christopher M. Newman, "What Exactly Are You Implying?":  The Elusive Nature of the Implied Copyright License, 32 Cardozo Arts & Ent. L.J. 501, 552 (2014) (canvassing the applicable case law and declaring that "[t]here is indisputably a federal common law of implied copyright licenses"). But cf. Foad Consulting Grp., Inc. v. Azzalino, 270 F.3d 821, 827 (9th Cir. 2001) ("[S]o long as it does not conflict with the Copyright Act, state law determines whether a copyright holder has granted [an implied] license.").  Certainly at common law generally a license (or, frankly, an agreement of most types) could be manifest and proven by the parties' conduct short of any magic words of assent.  See License, 2 Bouvier's Law Dictionary (2d ed., photo. reprint 2006) (1843) ("An implied license is one which though not expressly given, may be presumed from the acts of the party having a right to give it."); see also Restatement (Third) of Prop.:  Servitudes § 2.16 cmt. f (Am. Law Inst. 2000); Restatement (Second) of Contracts § 4 (Am. Law Inst. 1981).[2]  At the same time, at least some courts tended to be somewhat demanding in the type of proof required to show an implied license.  See Weldon v. Phila., Wilmington & Balt. R.R. Co., 43 A. 156, 159 (Del. Super. Ct. 1899) ("Such a license must be established by proof,

---

[2]  The issue of an implied sublicense does not appear to have come up much at common law.

- 9 -

and is not to be inferred from equivocal declarations or acts of the owner of the land."); see also Zellers v. State, 285 P.2d 962, 965 (quoting id.).

The case law dealing with copyrights accepts the possibility of implied licenses. See, e.g., Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 558 (9th Cir. 1990). See generally Newman, supra. And many courts have been rather demanding of parties claiming an implied copyright license in cases involving transactions between the owner and a putative licensee. See Estate of Hevia v. Portrio Corp., 602 F.3d 34, 41 (1st Cir. 2010) ("[I]mplied licenses are found only in narrow circumstances."); accord John G. Danielson, Inc. v. Winchester-Conant Props., Inc., 322 F.3d 26, 40 (1st Cir. 2003) (same).

Our circuit has had two implied-license cases that typify the general approach. In the first case, Danielson, we stated that "[t]he touchstone for finding an implied license . . . is intent." 322 F.3d at 40. Other circuits, we observed, have "beg[un] their analysis with a three-part test . . . requir[ing] that the licensee request the creation of the work, the licensor create and deliver the work, and the licensor intend that the licensee distribute the work." Id. at 41. However, those courts "quickly pass over the 'request' and 'delivery' issues to focus on manifestations of the [creator's] intent." Id. "We will do the same here," we said, id., and we did so by determining that the

creator did not intend to grant a license, so there was no need to evaluate the other elements, id. at 41–42. In assessing the creator's intent, we considered three factors:

> (1) whether the parties were engaged in a short-term discrete transaction as opposed to an ongoing relationship; (2) whether the creator utilized written contracts, such as the standard [American Institute of Architects] contract, providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible.

Id. at 41 (quoting Nelson–Salabes, Inc. v. Morningside Dev., LLC, 284 F.3d 505, 516 (4th Cir. 2002)).

In our second case, Estate of Hevia, we repeated much of the same legal framework as quoted in Danielson, including that the "request" and "delivery" elements can be "quickly pass[ed] over" and that the three-factor Nelson–Salabes test guides the analysis of intent. Estate of Hevia, 602 F.3d at 41. We found, under this framework, that the creator's intent was manifest, so we affirmed summary judgment for the defendant based on an implied license. Id. at 41–42. We did not analyze the request and delivery elements, perhaps because they were obviously satisfied under the facts of the case.[3]

---

[3] As PIC points out, Estate of Hevia perhaps could have been resolved without resort to the implied-license analysis at all,

At least two other circuits are arguably less flexible in determining whether the owner of a copyright has impliedly granted a license. In the Second and Seventh Circuits, the three elements (request, delivery, and intent) seem to be absolute requirements for establishing an implied license between the owner and a licensee. See Muhammad-Ali v. Final Call, Inc., 832 F.3d 755, 763 (7th Cir. 2016) (stating that, "[t]o establish an implied license, a party must show" request, delivery, and intent (emphasis added)); SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc., 211 F.3d 21, 25 (2d Cir. 2000) ("[C]ourts have found implied licenses only in 'narrow' circumstances where one party 'created a work at [the other's] request and handed it over, intending that [the other] copy and distribute it.'" (second and third alterations in original) (emphasis added) (quoting Effects Assocs., 908 F.2d at 558)). Two leading copyright treatises, however, suggest that this test is too rigid, and that implied licenses can sometimes be found if one or more of these elements is lacking. See 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 10.03[A][7]; 2 William F. Patry, Patry on Copyright § 5:131. And the Fifth and Ninth Circuits appear to have found implied licenses in cases where the three elements were not

since the defendant in that case might have owned the copyright ab initio under the "works made for hire" rule. See 17 U.S.C. § 201(b). The parties to the case, however, did not argue that point. See Estate of Hevia, 602 F.3d at 40 n.4.

strictly satisfied.  See Falcon Enters., Inc. v. Publ'rs Serv., Inc., 438 F. App'x 579, 581 (9th Cir. 2011) (mem.); Baisden v. I'm Ready Prods., Inc., 693 F.3d 491, 500–01 (5th Cir. 2012).

Against this background, PIC insists that the three-part test employed by many courts for assessing claims of an implied license from the copyright owner must be applied literally and inflexibly to assessing claims of an implied sublicense between a licensee and a sublicensee.  Such a literal application would mean that there could rarely if ever be an implied sublicense because, for example, the putative sublicensee generally deals only with the licensee, and likely would not have requested the owner to create the copyrighted work.  But it makes no more sense to use this test to assess the making of a sublicense than it would to require that an assignment of a mortgage meet the same requirements that might apply to the granting of a mortgage.  See generally Restatement (Third) of Prop.:  Mortgages §§ 1.5, 5.4 (Am. Law. Inst. 1997).  One would not, for example, deem an assignment by the mortgagee to a third party invalid because the owner/mortgagor did not sign it.[4]

---

[4]  PIC similarly contends that the multi-factor analysis of intent from Danielson and Estate of Hevia, which focuses on the state of mind of the copyright holder, similarly makes an implied license granted by anyone else impossible.  Again, that analysis was developed in a different context -- implied licenses, not implied sublicenses -- so it is inapposite to this case.

- 13 -

Practical considerations counsel against treating implied sublicenses as legally impossible. In the case of a sublicense, the copyright owner has the ability to set the conditions of sublicensing, at least where, as here, the initial license is in writing, is highly detailed, and expressly contemplates sublicensing. Cf. Catalogue Creatives, 2005 WL 1950231, at *2 (finding no implied sublicense where the original license was also implied). With ordinary implied licenses, it is the courts rather than the owner who sets the rules for establishing the agreement, so the courts may fairly be more protective of the owner's property rights in deciding whether the owner impliedly gave away some of those rights. With a sublicense, though, there is first a license, and the owner can set forth in the license the ground rules of the license itself -- including the rules by which the licensee may permit others to distribute the work. Here, for example, no party cites any reason why PIC, had it wished, could not have insisted in the license to Sylvania that a condition of that license was that sublicenses must be express, or perhaps even in writing. Or PIC could have instead negotiated a license that forbade sublicensing altogether. Instead, PIC and Sylvania agreed that Sylvania could "sub-license Use, and permit Use, in its sole and absolute discretion." So PIC already affirmatively gave away many of its rights, and courts need not protect it as much as they would otherwise.

We are also not persuaded by PIC's remaining policy arguments for why copyright sublicenses must be express. PIC argues that forbidding implied copyright sublicenses would further an "artist's right to control the work during the term of the copyright protection," Stewart v. Abend, 495 U.S. 207, 228 (1990), which in turn furthers "[t]he primary objective of the Copyright Act" by "encourag[ing] the production of original literary, artistic, and musical expression for the good of the public," Fogerty v. Fantasy, Inc., 510 U.S. 517, 524 (1994). But, as the case law notes, the "artist's right to control the work" must be "balance[d]" against "the public's need for access to creative works," and "dissemination of creative works is [also] a goal of the Copyright Act." Stewart, 495 U.S. at 228. Besides, this argument can be made in essentially any copyright dispute: a ruling in favor of the copyright holder increases the value of copyrights generally and thus promotes creativity. But that cannot mean that copyright holders always win. And the issue here -- the level of formality required for a sublicense -- is far more removed from the heart of copyright law than the kind of dispute directly dealing with what copyright law protects, like whether a work is copyrightable, see, e.g., Star Athletica, L.L.C. v. Varsity Brands, Inc., 137 S. Ct. 1002, 1016 (2017) (cheerleading uniforms); Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 58-60 (1884) (photographs), or whether fair use applies as a

- 15 -

defense to copyright infringement, see, e.g., Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 594 (1994) (musical parodies).  So we do not think the policy of promoting creativity helps PIC much in this case.

PIC also contends that requiring the extra formality that sublicenses be expressly granted would further the Copyright Act's policy of "enhancing predictability and certainty of copyright ownership."  Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 749 (1989).  But as we have already noted, PIC had an opportunity to set the conditions of sublicensing when it negotiated the well-defined license to Sylvania.  We think that opportunity sufficiently enhances predictability while also leaving the parties with more choice than would a judicial rule that sublicenses must be expressly granted.

As an illustration of its policy arguments, PIC points to the fact that Sylvania failed to tell Orgill about the attribution restriction.  PIC argues that if we require licensees in Sylvania's position to communicate expressly with their sublicensees, this sort of issue may be less likely to arise.  But the proposed solution does not quite fit the problem.  For whatever reason, Sylvania may well have neglected to relay the restriction even if it had expressly granted Orgill a sublicense.  PIC, after all, concedes that an express sublicense can be oral.  And in any event, as the arbitrator found, the attribution restriction was a

- 16 -

covenant between PIC and Sylvania, so the failure to abide by it is a bone that PIC needs to pick (and did pick) with Sylvania, not Orgill.

In sum, we hold that, where a licensor grants to a licensee the unrestricted right to sublicense and permit others to use a copyrighted work, a sublicense may be implied by the conduct of the sublicensor and sublicensee. So although implied sublicenses, like implied licenses, are probably not "an everyday occurrence in copyright matters," Estate of Hevia, 602 F.3d at 41, we reject the contention that they are a legal impossibility.

**B.**

We now turn to PIC's second argument, which is that summary judgment in favor of Orgill was not warranted because a reasonable jury could have found that Sylvania did not grant an implied sublicense to Orgill. We look to evidence of whether Sylvania by its actions sufficiently manifested an intent to grant such a sublicense. Ultimately we agree with the district court that no reasonable jury could find against Orgill on this point.

Initially, though, we must deal with two side issues. The first side issue arises from the fact that the district court based its ruling on the existence of a sublicense in this case in part on a perception that "PIC conceded at the [May 2015] hearing[ that] the defendants have borne their burden of showing that [Sylvania] impliedly licensed Orgill's use of the images."

- 17 -

PIC I, 118 F. Supp. 3d at 403; see also PIC II, 370 F. Supp. 3d at 244. PIC contends that it made no such concession. The transcript of the hearing is arguably mixed on whether PIC actually made an effective waiver/concession, although PIC's delay of nearly three years[5] in asking the court to withdraw its waiver finding cuts quite heavily against PIC. Nevertheless, we will again assume without deciding that there was no waiver. See Butynski v. Springfield Terminal Ry. Co., 592 F.3d 272, 277 (1st Cir. 2010) (remarking that a concession by counsel must be "clear and unambiguous" to bind a party).[6]

The second side issue concerns the standard of review. A license (implied or otherwise) is an affirmative defense to copyright infringement. See Danielson, 322 F.3d at 34, 40. As such, Orgill (the moving party) bears the burden of proof at trial on this issue. See id. So summary judgment is warranted only if Orgill has provided "conclusive" evidence proving the license. Torres Vargas v. Santiago Cummings, 149 F.3d 29, 35 (1st Cir. 1998); see also Leone v. Owsley, 810 F.3d 1149, 1153–54 (10th Cir.

---

[5] The district court's first opinion in this matter was published on July 29, 2015. PIC I, 118 F. Supp. 3d 398. PIC did not object to the district court's concession finding until its opposition to Orgill's renewed motion for summary judgment, which PIC filed on March 7, 2018, despite the fact that PIC updated the district court about other matters during the intervening period.

[6] Arguably, a contrary decision on our part would moot the preceding legal discussion as well, since the legal possibility of implied sublicenses would seem to be a necessary antecedent to Orgill's having been granted one.

2015) (collecting cases applying similar standards). In other words, the familiar framework that a movant who does not bear the burden of proof need only initially "point[] out . . . that there is an absence of evidence to support the nonmoving party's case," Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986), is inapplicable here. PIC argues that the district court in this case appears to have lost sight of this distinction, see PIC II, 370 F. Supp. 3d at 241–42 (citing cases applying the Celotex standard); PIC I, 118 F. Supp. 3d at 402 (same), but since our review on appeal is de novo, see Pac. Indem. Co. v. Deming, 828 F.3d 19, 22 (1st Cir. 2016), we may affirm under the correct standard so long as the record supports such a ruling. At the end of the day, the basic standard -- that summary judgment is warranted if "there is no genuine dispute as to any material fact" -- remains the same. Fed. R. Civ. P. 56(a).

Having dealt with the side issues, we now turn to PIC's main argument that the evidence was mixed enough to generate a jury question on whether Sylvania actually granted Orgill a sublicense. For the following reasons, we find that argument unconvincing.

First, the very nature of the business at hand makes it obvious that Sylvania wanted its distributors to use the photos, just as one might confidently say that Sylvania wanted Orgill to sell lots of Sylvania products. It would be effectively impossible

- 19 -

for Sylvania to expect its distributors to have much success in selling its lightbulbs without also permitting them to use photos of those lightbulbs.

Second, Sylvania paid a substantial sum -- roughly $3 million -- for its sixteen-page license granting it, among other things, the authority to "sub-license Use, and permit Use, in its sole and absolute discretion." A principal reason for Sylvania's paying so much for this agreement was precisely to allow its dealers and distributors to continue using the photos. Cf. Effects Assocs., 908 F.2d at 559 (remarking that the nonexistence of an implied license would be "a conclusion that can't be squared with the fact that [the defendant] paid [the plaintiff] almost $56,000 for" the work).

Third, as a matter of common sense, when Sills called up Sylvania and said he needed copies of the photos to use in selling Sylvania's lightbulbs, and Sylvania subsequently sent along the photos (or pointed Sills to where to find them), Sylvania surely manifested its permission for Sills (and Orgill) to use the photos in the proposed way, even though Sylvania never uttered some magic words that made express its permission. PIC objects to our consideration of this fact on the grounds that "the copyright statute forbids courts from inferring a transfer of copyright or a license from mere delivery of the material object in which the work is embodied." Corbello v. DeVito, 777 F.3d 1058, 1067 (9th

- 20 -

Cir. 2015) (citing 17 U.S.C. § 202). But we rely on the fact of delivery not in isolation, but as "'a relevant factor' to determine the existence of an implied [sub]license." Id. (quoting Asset Mktg. Sys., Inc. v. Gagnon, 542 F.3d 748, 755 n.4 (9th Cir. 2008)); see also Effects Assocs., 908 F.2d at 558 n.6 ("While delivery of a copy 'does not of itself convey any rights in the copyrighted work,' 17 U.S.C. § 202, it is one factor that may be relied upon in determining that an implied license has been granted." (emphasis in original)). Sylvania's delivery of the photos, combined with the context in which they were given, makes clear that Sylvania intended to allow Orgill to use them.

Fourth, Sylvania knew that Orgill was using the photos. Twice per year, Orgill provided Sylvania a copy of Orgill's catalog for Sylvania to review for accuracy. Although Sylvania has periodically responded to make various corrections to the listings in the catalog, Sylvania never objected that Orgill was using copyrighted photos without permission. See I.A.E., Inc. v. Shaver, 74 F.3d 768, 775 (7th Cir. 1996) (recognizing that consent to an implied license can be "given in the form of mere permission or lack of objection").

Fifth, Sylvania and Orgill entered into a "Confirmatory Copyright Sublicense Agreement" in July 2014, after PIC initiated this lawsuit. This document purports to be effective "nunc pro tunc as of June 1, 2006" and states that Sylvania "hereby confirms

- 21 -

that it previously granted permission to Orgill to Use and to sublicense the right to Use the Images to its dealers." PIC calls this agreement a "sham" intended to frustrate this litigation. And at least one court has held that, "[a]lthough the Copyright Act itself is silent on the issue of retroactive transfer or license, . . . such retroactive transfers . . . undermine the policies embodied by the Copyright Act." Davis v. Blige, 505 F.3d 90, 97-98 (2d Cir. 2007); see also PIC I, 118 F. Supp. 3d at 403 n.3. But the issue here is not whether the agreement by itself can operate as a retroactive sublicense, but rather whether it is evidence of Sylvania's prior intent to grant a sublicense. And certainly a statement by Sylvania itself provides such evidence.

Sixth, PIC successfully held Sylvania liable for breach of its covenant precisely because Sylvania permitted its third-party dealers and distributors to use the photos without attribution. Although the arbitrator did not explicitly call out Orgill as one of those distributors, the notion that Sylvania would have permitted (i.e., sublicensed) only some of these third parties to use the photos but not Orgill makes no sense.

For its part, PIC attempts to counter Orgill's strong evidence with evidence of its own. PIC first notes that Sylvania at some point prepared a "Photograph/Illustration Permission" form specifically requiring attribution to Picone, that Sylvania referred to this form in a "Do's and Don't's" statement, and that

- 22 -

Sylvania did not give Orgill either document. So, PIC says, "[a] jury could infer that had Sylvania intended to grant Orgill a sublicense, it would have followed its policies and used its permission form." But the arbitrator found that the "Do's and Don't's" statement was created <u>after</u> the license from PIC expired in 2012, so this document provides no insight into Sylvania's intent to grant permission (or not) during the contested period. In fact, the arbitrator stated, "[d]uring the six-year period of the [PIC–Sylvania] Agreement, [Sylvania] had <u>no</u> policies in place to ensure that its customers were using the PIC Images with the copyright notice" (emphasis added). Furthermore, there is no evidence that Sylvania gave these forms to <u>any</u> of its distributors, and we know from the arbitrator that those other distributors had sublicenses. So Sylvania's failure to diligently give out the permission form is at best evidence of Sylvania's "poor management" (in the arbitrator's words) of copyrighted images, rather than evidence that Sylvania did not intend to permit Orgill to use the images at all.

Along the same lines, PIC notes that Sylvania's public website states that "[t]his site or any portion of this site may not be reproduced, duplicated, copied, sold, resold, visited, or otherwise exploited for any commercial purpose without express written consent of [Sylvania]." Since Sills obtained some images from the website without this written consent, PIC argues, a jury

might assume that no permission was given. But again, the arbitrator foreclosed this when it determined that, during the contested period, Sylvania had no policy in place, or at least did not follow any purported policy, to control the images that it was sublicensing. And PIC's argument is strongly undercut by the fact that Orgill was using the photos with Sylvania's knowledge in furtherance of both of it and Sylvania's shared business objective (to sell more lightbulbs). So it is unsurprising in this context that Sylvania did not hold Orgill fast to the "written consent" statement.

PIC also tries to show that Orgill might not have "assent[ed] to a sublicense." It points to two facts in support of this: first, that Sills did not have "authority" to enter into contracts on Orgill's behalf, and second, that Orgill apparently did not know about Sylvania's copyright license or that PIC even existed. But PIC offers no explanation for why Orgill would have turned down Sylvania's grant of permission to use the photos Sylvania had of its own products in any event. And PIC's second point appears to defeat the first one anyway; if Orgill was unaware that the photos belonged to PIC, then there is no reason to think that Orgill would insist that one of its employees with "contracting authority" accept them. More to the point, Orgill, as defendant in this lawsuit, is clearly content to say that Sills's actions were binding on it in accepting a sublicense, and

it would be very peculiar for a jury to take PIC's word to the contrary in interpreting Orgill's intent, especially in view of the foregoing facts we have already discussed.

Having considered the entire record, we find it indisputable that Sylvania intended -- indeed, wanted -- Orgill to use the photos, and gave the photos to Orgill for precisely that purpose, just as the license itself anticipated and allowed. We therefore agree with the district court that Orgill has conclusively proven the existence of a sublicense and that no reasonable jury could find otherwise.

### III.

For the foregoing reasons, we affirm the grant of summary judgment in favor of Orgill.